Dash *against* Van Kleeck, late Sheriff of Albany.

THIS was an action of debt for an *escape*. The cause was tried at the *Albany* circuit, in *April*, 1810, before Mr. Justice *Thompson*.

The declaration contained two counts. 1. For suffering and permitting *Jason Rudes*, being in the defendant's custody, as sheriff of the county of *Albany*, on a *ca. sa.* at the suit of the plaintiff, to go at large out of his custody, &c. 2. For that the defendant having the said *Jason Rudes* in his custody, on such *ca. sa.* in pursuance of the statute in such case made and provided, permitted the said *Jason Rudes* to go at large within the limits of the liberties of the gaol of the city and county of *Albany*, and him then and there kept and detained, until the said *Jason Rudes*, afterwards, and while the defendant was sheriff, &c. without the leave or license, and against the will of the plaintiff, escaped and went at large without the said limits, &c. from and out of the custody, &c. contrary to the form of the statute in such case made and provided, whereby an action hath accrued, &c.

The defendant pleaded *nil debet*, with notice, that the escape of the prisoner out of the custody of the defendant, as mentioned in the plaintiff's declaration, if there was

Where, after an *escape* of a prisoner on execution, and return into custody, the sheriff went out of office, and assigned the prisoner to his successor, and while in his custody, the prisoner applied to the court for his discharge, under the act for the relief of debtors, &c. and the plaintiff, not knowing of the escape, opposed the application, in consequence of which the prisoner remained in custody; it was held, that this was not such an election to affirm the debtor in custody as amounted to a waiver of the plaintiff's remedy against the former sheriff for the escape.

The act of the 28th of April, 1810, (33d sess. c. 187.) is no bar to an action

brought against a sheriff, prior to the passing of that act, for the previous *escape* of a prisoner in his custody, and who had been admitted to the gaol liberties, on giving bonds pursuant to the act of the 30th of *March*, 1801. (24th sess. c. 91. s. 6.)

An act of the legislature is not to be construed to operate *retrospectively*, so as to take away a vested right.

It is a principle of universal jurisprudence, that laws, civil or criminal, must be *prospective*, and cannot have a *retroactive* effect.

any such escape, was wrongfully, privily and without the knowledge, permission, or consent of the defendant; and that the said *Jason Rudes*, afterwards, and before the exhibiting the bill of the plaintiff, &c. voluntarily, and of his own accord, returned back again into the custody of the defendant, and there remained until after the commencement of this suit. The plea was accompanied by an affidavit that the escape was involuntary.

It was admitted, at the trial, that *Rudes* was in the custody of the defendant, as sheriff, on the *ca. sa.* and was admitted to the liberties of the gaol, on giving bail according to the statute. It was proved, that on the 18th of *May*, 1807, *Rudes* went into the northern part of the city of *Albany*, and without the limits of the gaol liberties, and returned immediately thereafter, and before the commencement of this suit.

The defendant offered to prove that *Rudes*, immediately after the escape, returned, and remained within the liberties of the gaol until the defendant was removed from office, and another appointed in his stead, to whom the prisoner was duly assigned and delivered in custody, on the execution. That *Rudes*, being in custody of such sheriff, in pursuance of the " act for the relief of debtors, with respect to the imprisonment of their persons," in *August* term, 1808, and before the commencement of this suit, applied to the supreme court for relief, and that his application for a discharge was opposed by the counsel for the plaintiff, in consequence of which opposition *Rudes* was detained in the custody of the sheriff. This evidence was objected to by the plaintiff's counsel, and overruled by the judge, unless the defendant would also show that the plaintiff, at the time of opposing the prisoner's discharge, *knew* of the escape; but no proof of that fact was offered on the part of the defendant.

The judge decided that the act of the 5th *April*, 1810,

concerning escapes, &c. (33d sess. c. 187.) passed after issue joined, and before the trial, was no bar to the plaintiff's action; and directed the jury to find a verdict for the plaintiff. The jury found a verdict accordingly, for 478 dollars and 32 cents.

ALBANY,
Feb. 1811.

DASH
v.
VAN KLEECK.

A motion was made to set aside the verdict, and for a new trial, which was argued at the last *August* term.

*Rodman* and *Van Vechten*, for the defendant. The plaintiff had two remedies; he might waive the *escape* and affirm the prisoner in custody; or he might proceed against the sheriff for the escape. His right of action for the escape had accrued previous to the prisoner's application for a discharge. Having opposed the discharge, in consequence of which the prisoner remained in custody, the plaintiff must be considered as having made his election as to his remedy.*

* 4 *Johns. Rep.* 469. *Rawson* v. *Turner.*

Before the act concerning escapes, passed the 5th *April*, 1810,† the court, in consequence of the act relative to gaol liberties, were compelled to say, that where a prisoner is suffered to go within the liberties, on giving security to the sheriff, and he went beyond the liberties, a return or recaption before action would not excuse the sheriff, who must be left to his remedy on the bond. But the *third* section of that act declares the law to be, that notwithstanding the acts relative to gaols and gaolliberties, a return or recaption before a suit is brought for the escape, shall be a good defence, as at common law. It is true, the escape in the present case was before the passing of that act, but though a right of action attached before the act, yet it was not consummated by a verdict. The court are now called upon to decide as to the construction of the act.

† 33d sess. c.187.

*Henry*, contra. After the escape, the plaintiff's right of action attached; and a suit was commenced before the passing of the act. Is the act declaratory, or does it in-

troduce a new rule? If the legislature intended to pass a retrospective law, and to take away vested rights, the language ought to have been clear and explicit, so as to leave no doubt of the intention. We cannot presume that the legislature meant that the statute should have a retrospective effect. The legislature cannot take away a vested right. No statute is to have a retrospect beyond the time of its commencement.* But the language and provisions of the act are clearly prospective. The case of *Tillman* v. *Lansing*† shows that this was a statutory escape, and not within the common law doctrine as to escapes.

* *Bac. Abr. Statute,* (C.) vol. 6. p. 370

† 4 *Johns. Rep.* 45.

But it is said the plaintiff made his election, and affirmed the prisoner in custody of the new sheriff. A voluntary escape cannot be purged, and the sheriff was fixed by the statute.‡ If the sheriff permits an escape, he cannot retake the prisoner; but if the prisoner voluntarily returns, and is turned over to the custody of the new sheriff, he may avail himself of it; for he is not presumed to be conusant of the *torts* of his predecessor.

‡ 2 *Wils.* 295.

Again, there can be no election without knowledge; and it was not shown that when the plaintiff opposed the discharge of *Rudes*, he knew of the previous escape. The creditor has a right to the continued imprisonment of his debtor: and his consent to detain him in prison, after his return, does not take away his right of action for the time he was out of prison. Such an election would be without an equivalent.

*Cu. ad. vult.*

The judges being divided, now delivered their opinions *seriatim.*

YATES, J. The first question raised in this case, is, whether the opposition of the plaintiff to the discharge of the defendant in the original suit, under the insolvent

act, after the alleged escape had taken place, destroyed his right of action against the sheriff.

By this opposition the plaintiff admitted an existing demand against the original defendant, which, undoubtedly, was the ground of his interference to prevent the discharge, but whether, at the time, he had knowledge of the escape, does not appear, nor do I think it material.

If he supposed the conduct of the prisoner fraudulent, or the measures adopted by him to obtain his discharge, illegal, he had a right to prevent it; and this could not impair his remedy against the sheriff, if any such remedy existed at the time. The case of *Ravenscroft* v. *Eyles* (2 *Wils.* 295.) would then be in point.

The next question is, whether the alleged escape is cured by the statute of 1810.

By the facts disclosed, it does not appear that the defendant had knowledge of the prisoner's being without the gaol liberties; and even if it had been known to him, he had no right to restrain him, but could only resort to his bond for a breach of the condition; and if that statute is inoperative, the same remedy must exist here as in the case of *Tillman* v. *Lansing;* yet there the sheriff evidently knew it, and had seen the prisoner without the gaol liberties. Although, in this instance, it may be attended with peculiar hardship to the officer, the statutes upon which that decision is founded, if not explained by the last law, must continue to operate according to the construction given to them by this court. It must, however, be conceded, that this is a rigid interpretation of those statutes, manifestly intended for the benefit of debtors only, but destroying an existing remedy on the part of the officer; for at common law the defence now set up would have been sufficient to protect the sheriff; nor can I think that the legislature contemplated to increase his responsibility at the time; yet if the last law is disregarded, this must be the effect of

those statutes. It, therefore, remains for this court to determine whether the law of 1810 affords relief.

To say that the statutes so plainly manifest the intention of the legislature, in relation to the sheriff's responsibility, as to render the declaratory act inconsistent, is not warranted by what appears from the statutes themselves. I think the construction given to them by this court may well be viewed as unforeseen, and not intended, at the time they were passed; and that, without a violation of constitutional rights, that intention may properly become a subject of legislative explanation, so that no innocent man, by a literal construction, may receive damage, consonant to the rule laid down by Lord *Coke*, (1 *Inst.* 360.) that acts of parliament are to be so construed as no man that is innocent or free from injury or wrong, be, by a literal construction, punished or endamaged; and in that point of view the last law is entitled to notice.

The third section of this statute enacts, that nothing contained in the act, entitled, an act relative to gaols, or in the act rendering bonds taken for the gaol liberties assignable, and for other purposes, shall be so construed as to prevent any sheriff, in case of escapes, from availing himself, as at common law, of a defence arising from a recaption on fresh pursuit, and a returning of the prisoner within the custody of such officer before an action shall be commenced for the escape.

It appears by this section, that such a construction shall be given to those statutes as not to prevent any sheriff from setting up the defence he had at common law; evidently embracing all such cases as have arisen since the statutes mentioned in this act were passed, and such as might thereafter be presented to the courts; otherwise it was not necessary to state the true interpretation of those statutes; the defence might have been secured to the officer without it.

If those statutes had explicitly avowed the intention of

the legislature, and the doctrine of escape now urged had been known and allowed to have been plainly established by them, legislative interposition in this way would be inconsistent and improper; but the principle had never been recognised by our courts until the decision of *Tillman* v. *Lansing*, which took place in *February* term, 1809; and at the ensuing session of the legislature, this law, explaining the true construction of the former statutes, was passed, securing to the sheriff the benefit of the defence, as stated in the above section.

I think this case is clearly distinguishable from a known vested right, to which the doctrine cited from 4 *Bac.* would apply; that no statute ought to have a retrospect beyond the time of its commencement; but when we are convinced that it was the received opinion, after the passing of the statutes relative to gaols and gaol liberties, that sheriffs might avail themselves of this defence, and that those laws are not so positive as to supersede the necessity, or preclude the right of legislative explanation. Though the maxim of *communis error facit jus*, does not strictly apply; yet I am of opinion, under the circumstances of the case, the declaratory act must control this decision, and that the construction of the legislature must prevail.

There is nothing in the state constitution to prevent legislative interference; and being in the nature of a *tort*, and not a contract, this question cannot be affected by the constitution of the *United States*, which, in the 10th section, declares, that no state shall pass an *ex post facto* law, or law impairing the obligation of contracts.

If by an *ex post facto* law is intended all retrospective statutes, as well in relation to civil as criminal matters, then this court ought to pronounce the law in question nugatory, as being against the prohibition in the constitution of the *United States;* but I do not think that the definition of an *ex post facto* law can be extended beyond criminal matters; such laws are only intended,

as subject the citizen to punishment for an act done before the existence of the law, and declared criminal by such subsequent statute; or, according to Justice *Blackstone*, in his *Commentaries*, when, after an action (indifferent in itself) is committed, the legislature for the first time declares it to have been a crime, and inflicts a punishment on the person who has committed it.

It will not be pretended that the operation of this law could in any way impair the obligation of contracts. Hence it is manifest that the constitution of the *United States* does not reach this case.

I am, accordingly, of opinion, that the legislature were possessed of competent authority to pass this declaratory act; and that the defendant is entitled to his defence, as at common law, according to the construction given to the former statutes by this last law, and that, consequently, the verdict must be set aside, and a new trial granted.

SPENCER, J. The only questions which it is necessary for me to consider, are, whether the 3d section of the act of the 5th of *April* last, (sess. 33. c. 187.) extends to escapes which had then happened, whether suits are commenced or not; and whether, if it does, the legislature could pass such an act. It is enacted that nothing contained in the act entitled an act relative to gaols, or in the act rendering bonds taken for the gaol liberties assignable, and for other purposes, *shall be so construed*, as to prevent any sheriff, in cases of escapes, from availing himself, as at common law, of a defence arising from a recaption on fresh pursuit, and a returning of the prisoner within the custody of such officer before an action shall be commenced for the escape.

I have no difficulty in admitting the correctness of the position in *Bac. Abr. Statute*, (C.) (6 *Bac. Abr.* 370. *Gwillim's ed.*) that it is in general true, that no statute is to have a retrospect beyond the time of its commencement;

and that the law of parliament is, that regularly *nova con-* *stitutio futuris formam debet imponire non præteritis.*

The case of *Helmore* v. *Shuter and another*, or as it is reported in some of the books, *Gillmore* v. *Shuter*, (2 *Show.* 17.) was decided on that principle. It was an action on a parol promise in consideration of marriage, made in 1676. The statute of frauds, 2 *Car.* II. c. 3. enacted, that no action shall be brought from and after the 24th *June*, 1677, whereby to charge any person upon any agreement in consideration of marriage, unless some note or memorandum in writing be signed, &c. In the report of this case in *Shower*, which is quite full, *Scroggs*, Ch. J. *Wylde*, J. and *Jones*, J. said, they believed the intention of the makers of that statute was only to prevent for the future, and that it was a cautionary law, and if a motion was made in the house of lords concerning it, they would all explain it so ; besides, it would be a great mischief to explain it otherwise, to annul all promises by parol before that time, upon which men had trusted and depended, reckoning them good and valid in law, as they are yet amongst honest men ; and, therefore, judgment was given for the plaintiff. The same case is reported in 2 *Mod.* 310. 1 *Freem.* 466. 2 *Lev.* 227. 2 *Jones*, 108. and 1 *Vent.* 330.

The case of *Couch, qui tam*, v. *Jeffries* (4 *Burr.* 2460.) was decided on the same principle ; it was an action for the penalty for not paying the stamp duty upon an indenture. On the trial the plaintiff had a verdict; and it was moved to stay entering the judgment, the defendant having, after the verdict, paid the duty, pursuant to an act which discharged persons who had incurred penalties, upon paying the duty by a certain day, and before which it had been paid ; and the question was, whether the act related to actions commenced before its passing. Lord *Mansfield* placed his opinion on the intention of the legislature, which, he supposed, could not have been to take away from the person, who had incurred a great deal of cost in prosecuting it, a vested right. Mr. Jus-

tice *Yates* observed, that the payment ought to be made so that it can be given in evidence at the trial, and that it would be strange to make a construction with a retrospect to punish an innocent man in favour of an offender.

In these cases, the inquiry was into the intention of the legislature, taking as a leading guide, in aid of the construction, the presumption that all laws are prospective, and not retrospective.

Statutes are to be so construed as may best answer the intention which the makers had in view, and the intention is, sometimes, to be collected from the cause or necessity of making a statute ; and a thing within the intention of the makers of a statute is as much within the statute as if it were within the letter. (6 *Buc. Abr.* 384. *Gwillim's ed. Stat.* (I.) s. 5. and the cases there cited.) To ascertain the intention of the legislature, it is only necessary to consider, that prior to the case of *Tillman* v. *Lansing*, (4 *Johns. Rep.* 45.) decided in *February* term, 1809, the opinion had universally obtained, that a voluntary return of a prisoner, before action brought, (whether he had given bond for the gaol liberties or not,) in case of a negligent escape, was a good defence to the sheriff ; and in deciding that case, we put a construction on the statute relative to gaols, (though I concurred in it,) which I thought a rigid and harsh one, as respected public officers ; because, it rendered them liable to be drawn in question for acts which when done were supposed not to expose sheriffs, and after the lapse of many years, when their security, in many instances, may have become irresponsible.

The act now under consideration does not, in terms, notice suits then existing, or escapes which had then taken place ; but it does what is tantamount. It addresses itself to the judges of our courts, and requires such a construction to be put on the two acts, as not to take away from sheriffs the right of availing themselves of recap-

tion, or the voluntary return of the prisoner before action brought. It is, in effect, a declaratory statute ; in form, a directory one; and it would lead to a most absurd consequence to maintain that after the legislature has spoken its will, as to the construction of the pre-existing statutes, for courts of justice to proceed and apply the condemned rule to a certain set of cases, but with respect to cases precisely similar, though of a more recent date, adopt the construction required to be given. The statute does not profess to introduce a new rule, but considers sheriffs as always having had the right to protect themselves by recaption, or the voluntary return of the prisoner. If it was competent to the legislature to alter the law retrospectively, it appears to me that they have effectually done it.

The act implies that the legislature was dissatisfied with the exposition given to the statutes relative to gaols and gaol liberties, and they manifestly intended to reinstate the law, as they conceived it was when the decision of *Tillman* v. *Lansing* took place.

If a new rule was to have been made, it is inconceivable that such terms should have been used ; for a legislature to require a particular construction, contrary to the existing one, unless the anterior law would admit of the required construction, would be to require a flat absurdity. I understand the legislature as saying, in effect, we will not make a new rule, but we will require the law to be construed as it ought to have been.

It is idle, in this case, to talk of vested rights, to sue sheriffs for escapes, who have a defence arising from recaption, or a voluntary return of the prisoner, if that right existed when the act was passed, in the opinion of the legislature ; and it in fact becomes a question, in this inquiry, whether the right was vested or not, which has the supremacy, the legislature or the courts of justice. The case in *Shower* stands on a very different ground. When that parol promise was made it was unquestionably valid, and the promisee had a right to rely

on its fulfilment. So in the case of *ouch*, *qui tam*, *v. Jefferies*, the penalty had been incurred, and the right to prosecute for it became vested in the common informer. It had been prosecuted to verdict, and the plaintiff had become liable to his attorney for the costs; and, in fact, the defendant had lost his right to insist on the payment of the duty. He was entirely precluded by the verdict; and in both those cases it required the clearest manifestation of the will of the legislature, that the acts should retrospect. The present is a case *stricti juris*. The decision in *Tillman* v. *Lansing* subjected either the sheriffs or bail, who are favourites with courts of justice, to the payment of money, contrary to the then general understanding of the profession, and all parties concerned; and I cannot forbear repeating the idea that the legislature, under a conviction that the construction put on the acts in question was incorrect in principle, and unjust in its operation, intended, by an exertion of the plenary powers they possess, to rescue future cases not adjudicated, from the construction of the statutes adopted by this court. The construction which they require is that which the legislature consider the correct one.

The remaining question is, whether the legislature are inhibited, by any constitutional restraints, from passing the act. It is in vain to search for any prohibition in the state constitution; and if the constitution of the *United States* denies to the state legislatures the right to enact such a statute, it must be in the 10th sect. of the first article, which provides that no state shall pass an *ex post facto* law, or law impairing the obligation of contracts. Is this act an *ex post facto* law, or does it impair the obligation of contracts? The term *ex post facto* is technical, and is to be construed according to the received and well understood meaning and import of it, when the constitution was adopted. Judge *Blackstone* (1 *Comm.* 46.) had explained the term. His work was

the most popular then extant, and it was in the hands of all professional gentlemen, and of those who devoted their time and service to the state. He says, "an *ex post facto* law is when, after an action (indifferent in itself) is committed, the legislature, then, for the first time, declares it to have been a crime, and inflicts a punishment upon the person who has committed it."

The "*Federalist*," a work of high celebrity, and which is understood to have been the production of three eminent statesmen and civilians, two of whom had been members of the convention which formed the constitution, agree that this definition is correct, and that it is so to be understood. But the term has received a judicial exposition in the supreme court of the *United States*, in the case of *Calder and Wife* v. *Bull and Wife*, (3 *Dall.* 386.) All the judges who gave opinions agree that the inhibition in the constitution, against passing *ex post facto* laws by the states, is to be understood as relating to laws respecting crimes, pains and penalties; and they substantially adopt Judge *Blackstone's* definition. Thus far, then, there can be no objection to the act.

It cannot admit of an argument that the act impairs the obligation of contracts, for the most conclusive of all reasons, because no contract exists in the case. It is an action for a *tort*, for the wrongful escape of a debtor in the sheriff's custody; and it would be a waste of time to cite authorities, which are numberless, that the escape being a *tort*, the remedy is lost, if the sheriff should die; and there would be no relief against his representatives.

A difficulty still more formidable has been suggested, not, however, growing out of the constitution, but which equally attacks the power of the legislature. It is, as I understand, this; can a legislature, after a construction has been given to a statute by the courts of law, alter that construction by an act which has a retrospect, so as to affect existing cases?

It is not necessary to inquire whether a legislature can,

ALBANY,
Feb. 1811.

DASH
v.
VAN KLEECK.

by the plenitude of its power, annul an existing judg-
ment. This power I should undoubtedly deny, because
there then immediately arises a contract against the party
adjudged to pay a sum of money in favour of him to
whom it is awarded; but the question is, whether such
power is not necessarily inherent in sovereignty, before
trial and before judgment, to alter the construction of a
penal act, and to require courts of justice to observe the
construction required to be made.   On this point, we
have two clashing decisions in the supreme court of the
*United States*, if we may confide in the accuracy of the
reporters who have published the decisions of that court.
In the case of *Ogden, Adm'r*, v. *Blackledge, Ex'r*, (2
*Cranch's Rep.* 272.) the question was, whether an act of
the state of *North Carolina*, passed in 1715, enacting that
the creditors of deceased persons should make their
claim within seven years after the death of the debtor,
or otherwise be for ever debarred, was a bar to the cre-
ditors' recovering.   That act had been virtually repealed
in 1784, and absolutely in 1789; but in 1799, and after
that suit was brought, an act was passed explanatory of
the act of 1789, and declaring that it should not be con-
sidered a repeal of that part of the act, passed in 1715,
which created the limitation.   The court, in giving judg-
ment for the plaintiff, declared their opinion to be, that
the act of 1715 was no bar to the plaintiff's action, it
having been repealed by the act of 1789.   Not a word
is said, by the court, on the operation of the act of 1799;
and no reasoning is gone into, to evince the want of power
in the legislature, to pass the explanatory act of 1799,
though it must be conceded that the court disregarded
that act, or their judgment must have been different.
Whatever my respect may be for that high tribunal, I
cannot consent to be bound by a decision at variance,
not only with an anterior decision of the same court, but
so entirely destitute of reasoning or authority to sup-
port it.

The other case to which I allude is, that of *Calder*
*and Wife* v. *Bull and Wife*, before cited. It was this ; on
the 21st of *March*, 1793, the court of probates for *Hart-*
*ford* county, disapproved of the will of *N. Morrison*, and
refused to record it. No appeal was made from that de-
cree in 18 months, and by that neglect, and a statute of
*Connecticut*, all right of appeal was barred. In *May*,
1795, the legislature of *Connecticut* passed a resolution,
or law, setting aside the decree, and granted a new hear-
ing by the same court of probates, with a right of appeal
in six months. A new hearing took place ; the will was
approved and ordered to be recorded; an appeal was
carried to the superior court of the state, who affirmed
the decree; and on an appeal from that court to the court
of errors of *Connecticut*, it was adjudged there were no
errors; and from that court it came before the supreme
court of the *United States*, where the judgment was
affirmed.

In the progress of the cause, it appeared that the le-
gislature of *Connecticut* had, in two instances, since
1762, by resolutions, or acts, granted new trials in the
courts of law; and although it perplexed the judges,
whether to consider them as acting judicially, or legisla-
tively, they discussed the cause on both principles. It
would seem to me most certain, that it was utterly incon-
sistent with every principle of judicature to set aside the
operation of a law of the state, which had barred the
appeal, and adjudge a new law, opening it and limiting
a new appeal in that case, to six months. Indeed, it
surpasses my power of comprehension, to understand
how a legislature can be said to act judicially, in order-
ing a new hearing in another court, when it was not pos-
sessed of the cause, either by appeal or writ of error.
It certainly was a legislative act, in its extent of power,
and in its operation, much surpassing the act under
consideration, should it be construed to extend to cases

ALBANY,
Feb. 1811.

DASH
v.
VAN KLEECK.

which have already happened, and which have not been adjudicated.

I shall not undertake to state the arguments of the judges, for considering the law or resolution of the legislature of *Connecticut* valid; but to me their reasoning appears unanswerable; that the constitution having imposed no limits on the legislative power reaching the present case, the consequence is, that whatever the legislative power chooses to enact would be lawfully enacted, and the judicial power cannot interpose to pronounce it void. *Iredell,* Justice, lays down this position; and the decision of the court, in the particular case, sanctions it. *Paterson,* Justice, who was a member of the convention, which formed and proposed the constitution of the *United States,* says, " he had an ardent desire to have extended the provision in the constitution to retrospective laws in general;" and after some observations on the impropriety of such laws, he concludes, " But on full consideration, I am convinced, that *ex post facto* laws must be limited in the manner already expressed;" evidently meaning, that a retrospective law, as such, was not prohibited by the constitution.

This case I conceive to be a solemn determination of the question before us; and proving that the act cannot be objected to, because it is retrospective, if it be not an *ex post facto* law, or a law impairing the obligation of contracts.

The construction of statutes, undoubtedly, is a judicial function, subject, however, to the uncontrollable power of the legislature, to alter that construction in cases which have not passed to judgment; and I must insist, that our state legislature, when acting within the pale of the constitutions of the *United States* and of this state, has the same omnipotence which Judge *Blackstone* ascribes to the *British* parliament: " It has sovereign and uncontrollable authority, in the making, confirming, restraining, abrogating, repealing, reviving and *expounding* of laws,

concerning all matters of all possible denominations."
(1 *Bl. Comm.* 160.)

Upon the fullest consideration, I am of opinion, that the act of the 5th of *April* reaches this case, and that it is free from any constitutional objections.

THOMPSON, J. Whether the act of the 5th of *April,* 1810, (33d sess. c. 187.) shall affect the plaintiff's remedy against the sheriff, when not only the cause of action existed, but the suit had been *actually instituted before* the passing of the act, is the question which we are called upon to decide. This act declares, that nothing contained in the act relative to gaols, passed the 30th of *March,* 1801, or in the act rendering bonds, taken for the gaol liberties, assignable, passed the 28th of *March,* 1809, shall be so construed as to prevent any sheriff, coroner, or other officer, in cases of escapes, from availing himself, as at common law, of a defence arising from recaption on fresh pursuit, and a return of the prisoner, within the custody of such officer, before the action shall be commenced for the escape.

According to the unanimous opinion of this court, in the case of *Tillman* v. *Lansing,* (4 *Johns. Rep.* 45.) the true construction of the act of 1801, above referred to, went to take from the sheriff a right which he had at common law, to avail himself of a voluntary return of the prisoner, before suit brought, as a defence in an action against him for the escape. Under this construction of that statute, the present suit was brought, and, according to the facts found in the case, the plaintiff's right to recover against the sheriff was complete, and his suit pending, at the time the statute which is now said to devest him of that right, passed. It is repugnant to the first principles of justice, and the equal and permanent security of rights, to take, by law, the property of one individual, without his consent, and give it to another. The principle contended for, on the part of the defend-

ant, inevitably leads to, and sanctions, such a doctrine. For if the plaintiff can be deprived of his remedy already vested, with equal propriety might he be compelled to refund the money, had he actually received it. But we are not called upon to give effect and operation to a statute, admitting, in my judgment, of a retrospective construction. That the plaintiff had a vested right and remedy against the sheriff, on the 5th of *April*, 1810, cannot be doubted. It is a settled and established principle in *E gland*, that the power of construing statutes belongs to the courts of justice. (6 *Bac. Abr.* 178. *Hob.* 346.) This principle receives additional strength with us, when the boundaries between the legislative and judicial departments of the government are so well defined, and cautiously guarded. If, then, the construction of the act of 1801 belonged to the courts of justice, the interpretation given to it by this court became the fixed and settled rule of law, until altered by a superior tribunal, or by the legislature. It is not now, nor has it, at any time, been pretended, but that the construction given to that statute, was the true and only one of which it was susceptible. It follows, therefore, as a necessary consequence, that the plaintiff, at the commencement of his suit, had a vested right of recovery against the sheriff.

The next inquiry is, whether the legislature, by the act of the 5th of *April,* have taken away this right. It is unnecessary here to examine whether a law, admitting of such a construction, would be binding upon this court, because I am well satisfied, that according to the settled rules of interpretation, the one now before us will not admit of such a construction. If it was proper and necessary to inquire into the intention of the legislature, *aliunde*, by reference to other statutes on the same subject, the act of the 28th of *March*, 1809, affords a very strong inference that the act of the 5th of *April* was not intended to have a retrospective operation. That act was passed only one month after the decision in

the case of *Tilman* v. *Lansing*, and was in affirmance of the construction given by this court to the act of 1801; because it was made for the express purpose of meeting and removing some of the difficulties suggested by the court in that case; such as making the bonds, taken by the sheriff for the liberties, assignable, and authorizing the court, in case the plaintiff refused to take such assignment, to stay the proceedings against the sheriff, until he should have a reasonable time to prosecute such bond, and expressly declares, that this provision shall extend, as well to *suits now pending as to those hereafter to be commenced.* The sense of the legislature is here clearly shown, that without this express provision, the statute would not extend to suits then pending. It is reasonable, therefore, to conclude, that when the same subject was again under consideration, the next year, if it had been intended that the act then passed should affect suits already pending, it would, as in the other law, have been expressly so declared. The general rule is, that no statute is to have a retrospect beyond the time of its commencement; for the rule and law of parliament is, that *nova constitutio futuris formam debet imponere, non præteritis.* (6 *Bac. Abr.* 370. 2 *Inst.* 292.) *Blackstone*, in his *Commentaries*, treats it as a first principle, that all laws are to commence *in futuro*, and operate prospectively. (1 *Comm.* 44.) After referring to the unjust and iniquitous practice of the *Roman* emperor, (*Caligula*,) as to the manner of writing and publishing his laws, he observes, that there is still a *more unreasonable* method than this, which is called making laws *ex post facto.* Although, technically speaking, the term *ex post facto* may be applicable only to laws punishing criminal offences, the principle is equally applicable to civil cases. An act of the legislature ought never to be so construed as to do injustice. Lord *Coke* lays down the rule to be, (*Co. Litt.* 360. a.) that acts of parliament are to be so construed, as that no man who is innocent, or free from injury or wrong,

shall, by a literal interpretation, be punished or endamaged. Giving to the act now under consideration a retrospective operation, would manifestly be productive of these consequences; for it not only takes away a vested right, but punishes and endamages the plaintiff, in the payment of costs. If his action is defeated, and his right of recovery taken away by this statute, he not only loses his own costs, but will be obliged to pay costs to the defendant. It never can be presumed, from the general words of this statute, that the legislature intended that it should work such injustice. Nothing short of the most direct and unequivocal expressions would justify such a conclusion. The best settled rule of construction given by the *English* courts to the statute of frauds, (29 *Car*. II. c. 3.) goes strongly in corroboration of the interpretation I have given to the act before us. The language of that statute is, " that from and after the 24*th of June*, 1677, *no action shall be brought*, whereby to charge any person upon an agreement in consideration, &c. Yet it has been uniformly held, that it would not retrospect, so as to take away a right of action to which a party was before that time entitled, but applied only to *promises made after* the 24th of *June*, 1677. (4 *Burr*. 2560. 2 *Shower*, 17. 2 *Mod*. 310. 1 *Vent*. 330.)

The act of the 5th of *April*, 1810, can be viewed in no other light than as introducing a *new rule of law*. It does not purport to be an explanatory statute, or profess to give a different construction to the act of 1801 than had been given to it by this court. But the legislature, proceeding on the ground that a competent tribunal had declared, that under that act sheriffs could not avail themselves of a voluntary return of a prisoner, before suit brought, in discharge of their liability for an escape, as they might have done at common law, thought proper to restore to sheriffs this common law right, which had been taken away by the statute of 1801, and so far to repeal that statute. It is an undeniable

rule of construction, that a subsequent statute, making a different provision on the same subject, is not an explanatory act, but an implied repeal of the former, which is precisely the case here. I do not, therefore, perceive any possible escape from the conclusion, that the act under consideration establishes a *new rule of law*, and as such ought not to have a retrospective operation, unless so declared, in the most unequivocal manner, which it certainly is not.

But if we consider this in the nature of an *explanatory act*, it will operate equally against the defendant's construction; for such statutes are to be construed only according to the *words*, and not with any equity or intendment, as was resolved in *Butler* and *Baker's* case, (3 *Coke*, 35. a.) for if any exposition should be made against the direct letter of the exposition made by parliament, there would be no end to expositions. So in the case of *Dalbury Parish* v. *Foster*, (*Carthew*, 396.) the doctrine laid down is, that when one statute is made explanatory of another, the court cannot vary the explanation farther than is expressed in the statute. Where the statute of explanation is doubtful, it may have such exposition as shall be taken to stand with the scope and intention of the statute, and which shall be *reasonable*, as was held by the court, in *Godfrey* v. *Wade*, (*Jones*, 35. 19 *Vin.* 517. note.) An act which is to take away or clog a remedy which a party has by the *common law, shall not be taken by equity;* (19 *Vin.* 514.) and there is no reason why the same rule should not apply, where a remedy given by the *statute* is to be taken away. Construing this act grammatically, according to the words, the provision is *prospective*, " that nothing in the former act *shall be* construed to prevent," &c. If the construction be *doubtful*, and the rule in *Godfrey* and *Wade* be applied, can it for a moment be questioned, that it is more just and *reasonable* to confine it to cases arising, or at

all events, to suits brought *after* the passing of the act, so as not to punish plaintiffs with costs, when they had a good and valid cause of action at the commencement of the suit. In the case of *Ogden* v. *Blackledge*, (2 *Cranch*, 272.) in the supreme court of the *United States*, the effect and operation of an *explanatory* statute was under consideration. In that case, as in this, the statute was passed *after* the commencement of the suit. And it was urged by counsel, that if the *suit* had been brought *after* the passing of the explanatory act, it would not alter the past law, and make that to have been law which was not law at the time. To declare what the law *is*, *or has been*, *is a judicial power;* to declare what the law *shall. be*, is legislative. One of the fundamental principles of all our governments is, that the legislative power shall be separate from the judicial. But that, at all events, the statute could not affect *that suit*, which was brought *before* the law was passed. The court stopped the counsel, considering the question as too plain to be argued. This case is precisely in point, and although not binding on this court, is entitled to high respect and attention. The language of *Raymond*, J. in the case of *Wilkinson* v. *Myer*, (2 Ld. *Raym*. 1352.) seems to imply, that laws denominated *ex post facto* are not confined to criminal cases. Speaking of the statute of *Geo.* I. relative to registering contracts for *South Sea* stock, he says, this act being *ex post facto*, the construction of the words ought not to be *strained*, in order to defeat a *contract*, to the benefit whereof the party was well entitled at the time the contract was made. Admitting this not to have been technically an *ex post facto* law, as I have no doubt it was not, yet it shows the light in which, according to the opinion of the judge, all retrospective laws are to be viewed, and the rules of construction applicable to them. The exposition of the prohibition in the constitution of the *United States*, against passing *ex post*

*facto* laws, came before the supreme court of the *United States*, in the case of *Calder* v. *Ball*, (3 *Dallas*, 386.) where it was held, that the prohibition applied only to criminal, and not to civil cases. The law there under consideration was viewed rather as a judicial than a legislative act; it being a mode of obtaining a new trial, authorized by the course of judicial proceedings in the state of *Connecticut*. And, at all events, if it was to be considered a legislative act, it not being an *ex post facto* law, within the meaning of the constitution, it did not belong to that court to declare it void. Although the point in judgment, in that case, is not directly applicable to the one before us, yet the doctrine of the judges against retrospective laws in general is founded in so much good sense and sound policy, that it is not only deserving of notice, but worthy of adoption. *Chase*, J. said, every *ex post facto* law must necessarily be retrospective, but every retrospective law is not an *ex post facto* law; the former only are prohibited by the constitution. Every law that takes away or impairs *rights vested* agreeable to existing laws, is retrospective, and is generally unjust, and it is a good general rule, that a law should have no retrospect. And he urges, as a reason why the constitution did not prohibit all retrospective laws, that it is not to be presumed that the federal or state legislatures will pass laws to deprive citizens of rights vested in them by existing laws, unless for the benefit of the whole community, and on making full satisfaction. *Paterson*, J. observed, that the words *ex post facto*, when applied to a law, have a technical meaning, and refer to crimes, pains and penalties. But, says he, I had an ardent desire to have extended the provisions of the constitution to *retrospective* laws in general, for there is neither policy nor safety in such laws, and, therefore, I have always had a strong aversion against them. It may, in general, be truly observed of

retrospective laws of every description, that they neither accord with sound legislation, nor the fundamental principles of the social compact. If such be the light in which retrospective laws ought to be received, how unjust the imputation against the legislature, that they intend a law to be of that description, unless the most clear and unequivocal expressions are adopted. I am satisfied the law before us does not necessarily, or even reasonably, admit of such an interpretation, and of course cannot affect the present action.

There is no weight in the objection, that the plaintiff's opposition to the prisoner's discharge from imprisonment was a waiver of his claim on the sheriff for the escape. He knew nothing of the escape when he opposed the discharge, and this was essential, in order to charge him with having made an election of remedies, according to the decision of the court, in the case of *Rawson & Turner.* (4 *Johns. Rep.* 474.) A party can never be said to have made an election between two remedies, when he was totally ignorant of one of them. I am accordingly against the motion for a new trial.

KENT, Ch. J. The motion on the part of the defendant for a new trial was made upon two grounds:

1. That the plaintiff affirmed his debt, in custody, subsequent to the escape.

2. That the statute of the 5th of *April* last allows the defendant to avail himself of the return of the prisoner before suit brought.

1. The mere fact of opposing the debtor's discharge without having, at the time, any knowledge of the previous escape, cannot conclude the plaintiff. He undoubtedly might, with knowledge of the escape, have waived his remedy against the defendant, and have elected to affirm his debtor in custody under the succeeding sheriff; but without such knowledge the law will not infer any determination of the party preju-

dicial to his rights. It would be equally unjust and absurd to conclude, that the plaintiff had waived his remedy for the escape, when he was ignorant of the fact. "Election," says *Dyer*, (*Dyer*, 281. a.) " is the internal, free and spontaneous separation of one thing from another, without compulsion, consisting in the mind and will."

2. The next question is, whether the act of the 5th of *April* last created any new plea in bar of the action.

The words of the act are, that nothing contained in the act entitled, an act relative to gaols, passed *March* 30, 1801, or in the act entitled, an act rendering bonds taken for the gaol liberties assignable, and for other purposes, passed *March* 28, 1809, shall be so construed as to prevent any sheriff, coroner, or other officer, in cases of escapes, from availing himself, as at common law, of a defence arising from a recaption on fresh pursuit, and a returning of the prisoner within the custody of such officer, before an action shall be commenced for the escape."

As this act was passed, not only after the escape in question, but after suit brought, it cannot apply to and govern this case, but in one of two ways. It must be considered either as creating a new rule for the government of the past case, or as declaring the interpretation of the former statutes for the direction of the courts.

I think it can be shown, that upon principles of law and the constitution, the act cannot be adjudged to operate in either of those points of view; and I should be unwilling to consider any act as so intended, unless that intention was made manifest by express words, because it would be a violation of fundamental principles, which is never to be presumed.

This act, according to a very natural and reasonable construction, is prospective, and applies only to escapes happening after the passing of it. If it meant that the

provision in the act giving the plea should apply to past escapes, why did it limit suits for such escapes to six months, and for future escapes to one year? The very great reduction of the time of limitation in the first case, must have been made on the ground of the supposed hardship of the then existing law. There would have been no reason for varying the period of limitation, if the same beneficial plea was intended to apply to both cases. The language of the section in question is strictly and grammatically applicable only to actions to be commenced;—" before an action shall be commenced for the escape." I am persuaded that the act was understood in the council of revision to read prospectively, or it would not have passed without further consideration. This construction is agreeable to those settled rules which the wisdom of the common law has established for the interpretation of statutes, as it is not inconvenient, nor against reason, and injures no person. A statute is never to be construed against the plain and obvious dictates of reason. The common law, says Lord *Coke*, (8 *Co.* 118. a.) adjudgeth a statute so far void; and upon this principle the supreme court of *South Carolina* proceeded, when it held, (1 *Bay*, 93.) that the courts were bound to give such a construction to a statute as was consistent with justice, though contrary to the letter of it. The very essence of a new law is a rule for future cases. The construction here contended for on the part of the defendant, would make the statute operate unjustly. It would make it defeat a suit already commenced, upon a right already vested. This would be punishing an innocent party with costs, as well as devesting him of a right previously acquired under the existing law. Nothing could be more alarming than such a subversion of principle. A statute ought never to receive such a construction, if it be susceptible of any other, and the statute before us can have a reasonable object and full operation without it. In the case of

*Beadleston* v. *Sprague,* (6 *Johns. Rep.* 101.) this court unhesitatingly acknowledged the principle, that a statute is not to be construed so as to work a destruction of a right previously attached. We are to presume, out of respect to the lawgiver, that the statute was not meant to operate retrospectively; and if we call to our attention the general sense of mankind on the subject of retrospective laws, it will afford us the best reason to conclude, that the legislature did not intend in this case to set so pernicious a precedent. How can we possibly suppose, that in so unimportant a case, when there were no strong passions to agitate, and no great interest to impel, that the legislature coolly meant the prostration of a principle which has become venerable for the antiquity and the universality of its sanction, and is acknowledged as an element of jurisprudence?

A review of the cases on this subject may be interesting and instructive.

It is a principle in the *English* common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect. *Nova constitutio futuris formam imponere debet, et non præteritis.* (*Bracton,* lib. 4. fol. 228. 2 *Inst.* 292.) This was the doctrine as laid down by *Bracton* and *Coke;* and in *Gilmore* v. *Shuter* (2 *Mod.* 310. 2 *Lev.* 227. 2 *Jones,* 108.) it received a solemn recognition in the court of K. B. In that case a suit was brought after the 24th of *June,* 1677, upon a parol promise made before that date, but to be performed after that date, and the question was, whether it was void by the statute of frauds and perjuries, which enacted, that " from and after the 24th of *June,* 1677, no action should be brought to charge any person upon any agreement made in consideration of marriage, &c. unless such agreement be in writing," &c. It was admitted that the promise declared on was of the same kind with those mentioned in the statute, but the court agreed unanimously, that the statute was

to be read by a transposition of the words, for that it was not to be presumed that the act had a retrospect to take away an action to which the plaintiff was then entitled, and that the other construction would make the act repugnant to common justice. When we consider that this decision was pronounced as early as the reign of *Charles* II. we are forcibly impressed with the spirit of equity, and the independence of the *English* courts. So again, in the modern case of *Couch* v. *Jefferies*, (4 *Burr.* 2460.) which was a *qui tam* suit for a penalty, the question was, whether a statute passed after the commencement of the suit, allowing delinquents, by such a day, to pay a stamp duty, and rid themselves of the penalty, should affect the case of a suit already commenced, and the court of K. B. unanimously determined that it could not. " It can never be the true construction of this act," said Lord *Mansfield*, " to take away this vested right, and punish the innocent pursuer of it with costs."

The maxim in *Bracton* was probably taken from the civil law, for we find in that system the same principle, that the lawgiver cannot alter his mind to the prejudice of a vested right. *Nemo potest mutare consilium suum in alterius injuriam.* (*Dig.* 50. 17. 75.) This maxim of *Papinian* is general in its terms; but Dr. *Taylor* (*Elements of the Civil Law*, 168.) applies it directly as a restriction upon the lawgiver; and a declaration in the *Code* leaves no doubt as to the sense of the civil law. *Leges et constitutiones futuris certum est dare formam negotiis, non ad facta præterita revocari, nisi nominatim, et de præterito tempore, et adhuc pendentibus negotiis cautum sit.* (*Cod.* 1. 14. 7.) This passage, according to the best interpretation of the civilians, relates not merely to future suits, but to future as contradistinguished from past contracts and vested rights. (*Perezii Prælec.* h. t.) It is, indeed, admitted, that the prince may enact a retrospective law, provided it be done *expressly;* for the will

of the prince, under the despotism of the *Roman* em-
perors, was paramount to every obligation. Great latitude
was anciently allowed to legislative expositions of sta-
tutes; for the separation of the judicial from the legis-
lative power was not then distinctly known or prescribed.
The prince was in the habit of interpreting his own laws
for particular occasions. This was called the *interlocutio
principis;* and this, according to *Huber's* definition, was,
*quando principes inter partes loquuntur, et jus dicunt.*
(*Prælec. Juris Rom.* vol. 2. 545.) No correct civilian,
and especially no proud admirer of the ancient republic,
(if any such then existed,) could have reflected on this
interference with private rights and pending suits, with-
out disgust and indignation; and we are rather surprised
to find, that under the violent and irregular genius of
the *Roman* government, the principle before us should
have been acknowledged and obeyed to the extent in
which we find it. The fact shows, that it must be found-
ed in the clearest justice.

Our case is happily very different from that of the
subjects of *Justinian.* With us the power of the law-
giver is limited and defined; the judicial is regarded
as a distinct independent power : private rights have been
better understood and more exalted in public estimation,
as well as secured by provisions dictated by the spirit
of freedom, and unknown to the civil law. Our con-
stitutions do not admit the power assumed by the *Ro-
man* prince; and the principle we are considering
is now to be regarded as sacred. It is not pretended
that we have any express constitutional provision on
the subject; nor have we any for numerous other rights
dear alike to freedom and to justice. An *ex post facto*
law, in the strict technical sense of the term, is usually
understood to apply to criminal cases, and this is its
meaning, when used in the constitution of the *United
States;* yet laws impairing previously acquired *civil*
rights are equally within the reason of that prohibition,
and equally to be condemned. We have seen that the

cases in the *English* and in the civil law apply to such rights; and we shall find, upon further examination, that there is no distinction in principle, nor any recognised in practice, between a law punishing a person criminally, for a past innocent act, or punishing him civilly by devesting him of a lawfully acquired right. The distinction consists only in the degree of the oppression, and history teaches us that the government which can deliberately violate the one right soon ceases to regard the other.

There has not been, perhaps, a distinguished jurist or elementary writer, within the last two centuries, who has had occasion to take notice of retrospective laws, either civil or criminal, but has mentioned them with caution, distrust, or disapprobation. Numerous authorities might be cited, but I will select only two, and those no ordinary names. Lord *Bacon* gives more toleration to retrospective, and particularly to declaratory laws, than can now be admitted, under our more precise and accurate distribution and limitation of the powers of government; yet he was, at the same time, duly sensible of their danger and injustice. He confines them to special cases, limits them with solicitude, and speaks of them in general with reproach. *Leges quæ retrospiciunt raro, et magna cum cautione sunt adhibendæ; neque enim placet Janus in Legibus.—Cavendum tamen est, ne convellantur res judicatæ.—Leges declaratorias ne ordinato, nisi in casibus, ubi leges cùm justitia retrospicere possint.* (De Aug. Scient. Lib. 8. c. 3. Aphor. 47—51.) *Puffendorf* lays down, without any qualification, a general and pointed condemnation of all such laws; he says, " a law can be repealed by the lawgiver, but the rights which have been acquired under it, while it was in force, do not thereby cease. It would be an act of absolute injustice to abolish with a law all the effects which it had produced. Suppose, for example, that there exists a law that the father of a family may dis-

pose of his property by will, the legislature may without doubt restrain this unlimited right of disposing by will, but it would be unjust to take away the property acquired by will during the existence of the former law." (*Droit de la Nat. L.* 1. c. 6. s. 6.)

The constitution of *New Hampshire*, established in 1792, has an article, in its bill of rights, that " retrospective laws are highly injurious, oppressive, and unjust; and that no such laws should be made, either for the decision of civil causes, or the punishment of offences." It was also an article in the constitution, established for the *French* republic, in the year 1795, that no law, criminal or civil, could have a retroactive effect:—"Aucune loi, ni criminelle, ni civile, ne peut avoir d'effet rétroactif." Even *French* despotism, atrocious as it is in practice, yields, in its laws, to the authority of such a principle; for the same limitation is laid down as a fundamental truth in the code now in force under the sanction of the *French* empire. (*Code civil des Français,* No. 2.) And as often as the question has been brought before the courts of justice in this country, they have uniformly said, that the objection to retrospective laws applies as well to those which affect civil rights, as to those which relate to crimes.

In the case of *Osborne* v. *Huger*, (1 *Bay's Rep.* 179.) which came before the supreme court of *South Carolina* in 1791, the question arose upon a statute relative to the duty of sheriffs as to civil process; the court rejected the construction of a retrospective operation of the statute, according to its literal meaning; and Judge *Burke*, in particular, said that he should not be for construing a law so as to devest a right; and that a retrospective law in that sense would be against the constitution of the state. The judges of the supreme court of the *United States*, in the case of *Calder* v. *Bull*, (3 *Dallas*,386.) speak in strong terms of disapprobation of all such laws; and in *Ogden* v. *Blackledge*, (2 *Cranch*, 272.)

ALBANY,
Feb. 1811.

DASH
v.
VAN KLEECK.

they considered the point too plain for argument, that a statute could not retrospect, so as to take away a vested civil right.

This train of authority declaratory of the common sense and reason of the most civilized states, ancient and modern, on the point before us, is sufficient, as I apprehend, to put it at rest; and to cause not only the judicial, but even the legislative authority to bow with reverence to such a sanction.

It is equally inadmissible to consider the act as declaring how the former statutes were to be *construed,* as to cases already existing. If this interpretation was to be considered as giving the former acts a new meaning, it then becomes a new rule, and is to have the same effect, as any other newly created statute. But if it be considered as an exposition of the former acts for the information and government of the courts in the decision of causes before them, it would then be taking cognisance of a judicial question. This could not *possibly* have been the meaning of the act, for the power that makes is not the power to construe a law. It is a well settled axiom that the union of these two powers is tyranny. Theorists and practical statesmen concur in this opinion. Our government, like all the other free governments upon this continent, and like the only free government, at present, remaining in *Europe,* consists of departments, and contains a marked separation of the legislative and judicial powers. The constitutions of several of the *United States,* and among others, those of *Massachusetts* and *Virginia,* have an express provision, that the legislative and judicial powers shall be preserved separate and distinct, so that one department shall not exercise the functions belonging to the other. Most of the models of a free and limited constitution which were produced in *Europe,* under the impulse of the late revolution, and, which had any pretensions to skill or wisdom, and particularly the new constitutions of *Po-*

*land* and *France* in 1791, and of *France* in 1795, contained the same provision, in language more or less explicit. And if it be not found in our own constitution, in terms, it exists there in substance; in the organization and distribution of the powers of the departments, and in the declaration that the " supreme *legislative* power" shall be vested in the senate and assembly. No maxim has been more universally received and cherished as a vital principle of freedom. And without having recourse to the authority of elementary writers, or to the popular conventions of *Europe*, we have a most commanding authority, in the sense of the *American* people, that the right to interpret laws does, and ought to belong exclusively to the courts of justice.

For these reasons, I consider that the case before the court ought to be decided precisely as if the act of the 5th of last *April* had not been passed. The point then is, whether by the act of 1801 the defendant was liable for the voluntary escape of his prisoner in 1807 from the liberties, notwithstanding the immediate return of the prisoner. If the sheriff had allowed to his prisoner the liberties of the gaol, without taking a bond of indemnity, he might have pleaded a recaption before suit brought. This was so declared in the case of *Peters & Gedney* v. *Henry*, (6 *Johns. Rep.* 121.) and the reason is, that the sheriff, in that case, may restrain the prisoner at his pleasure and deny him the liberties, for he is not bound to give them, until he receives, or is offered, a competent indemnity. And if the prisoner should, at any time, voluntarily go out of the liberties, the sheriff would then, probably, be obliged to confine him in close custody, or be responsible thereafter, as for a *voluntary* escape according to the doctrine in *Bonafous* v. *Walker*. (2 *Term Rep.* 126.) It is stated in this case that the debtor was admitted to the liberties, on giving bail, and the decision in *Tillman* v. *Lansing* (4 *Johns. Rep.* 45.) is, therefore, in

point. If I was satisfied that the court in that case had mistaken the law, I should be willing, with my brethren, to correct the mistake; but the more I reflect upon the subject, the more I am persuaded that *that* decision was a just exposition of the law, as it then stood, and that the defendant is answerable for the escape.

The principles and ground of that decision are so reasonable and just, that they must have met with universal assent from the intelligent part of the community.

The sheriff was bound to give his prisoner the liberties, upon receiving a sufficient bond of indemnity, and when he took the bond he had no further control over the prisoner. He could not prevent him from going at large, nor punish him if he did. The condition of the bond, according to the words of the statute, was, " that he remain a true and faithful prisoner, and shall not, at any time, nor in any wise, escape, or go without the limits of the liberties, until discharged by due course of law." It was proved that the prisoner, in that case, as well as here, did frequently and wilfully go without the limits of the liberties, contrary to the condition of his bond; and if the sheriff was not responsible, because he could show that the prisoner had returned before suit brought, it would have gone, in a great degree, to have rendered imprisonment illusory, as to all prisoners who were able to tender the sheriff competent security. If the sheriff was not responsible to the creditor, the prisoner was not responsible to the sheriff. Prisoners would have been able to go whenever and wherever they pleased, only taking care to return within the limits before any process was sued out against the sheriff. If the creditor lived remote, it might be months before he had knowledge that his debtor was abroad, despising the coercion of the law; and when he attempted to prosecute the sheriff, he might find that the debtor had cunningly returned within the limits, and was only waiting a fit occasion to make another escape. A law that could have been eluded in this

way would have been a disgrace to the government. The statute creating gaol liberties was passed for humane purposes. Debtors now have comfortable accommodations, and a large space to occupy, in which they can carry on their business and enjoy the comforts of society. It would be a gross abuse of this act of humanity, to seek under it a shelter for fraud. The construction adopted by the court was such as to reach this abuse; and as the law then stood, no other construction would reach it, for the bonds were not assignable to the creditor. It was a construction not only reasonable, (for the law of 1801 never meant that the bond should be broken with impunity, as it said " that nothing in the act should be construed to exonerate the sheriff in case any such prisoner should escape and go at large without the said liberties,") but it was attended with salutary results. It tended to make prisoners what they ought to be, and what they bind themselves by their bonds to be, " true and faithful." The sheriff has not means or authority to guard the limits. There is no restraint upon the prisoner but the bond, and he ought to be continually conscious that it will be forfeited and exacted on the first wilful disobedience. If he will " go without the limits of the liberties," he ought to pay the penalty for his violation of duty and the faith of contract. To have allowed the plea of recaption or return before suit brought, as the law was at the time of the decision in *Tillman* v. *Lansing*, would have been the same, in effect, as to have allowed it to the prisoner on his bond of indemnity, and that would have been monstrous. There could not, strictly, be any recaption in the case; for the sheriff loses his coercion of the prisoner when he takes the bond. To talk of retaking the prisoner and replacing him within the liberties from whence he might immediately depart, would be ridiculous. The sheriff's only plea could be, that the prisoner had voluntarily escaped, had forfeited his bond, and had voluntarily returned before suit; and if it was

ALBANY,
Feb. 1811.

DASH
v.
VAN KLEECK.

ALBANY,
Feb. 1811.

DASH
v.
VAN KLEECK.

good for him, it excused the prisoner. That decision was therefore founded, not only on the most reasonable interpretation of the act of 1801, but on the soundest principles of justice. The law enabled the sheriff to provide himself with ample security, and armed him beforehand with his indemnity; and therefore the reason of allowing the plea of recaption did not apply. That plea was granted by way of excuse to the sheriff, to save him from grievous losses in cases where he would have been without remedy. But where he had his certain remedy over, there was no necessity for the excuse, and the common law did not originally allow it. Thus, if the gaol be broken by public enemies and the prisoners escape, this, say the books, excuses the sheriff, because he has no remedy against them; but if it be broken by rebels, it does not excuse him, for he has his remedy over. There was no more hardship in obliging the sheriff to take this bond at his peril, than there is in his taking a bail-bond at his peril; and that has been the law for centuries.

The courts in *Massachusetts* construe the bonds taken in that state, for gaol liberties, with the same strictness. In *Bartlett* v. *Willis and others*, (3 *Tyng*, 86.) a bond was given by the prisoner for the gaol limits, conditioned " that he should continue a true prisoner in the custody of the gaoler, and within the limits of the said prison ;" and it was held that the prisoner's going, in the night time, to a pump for water, which was without the limits, was an escape, and the debt was recovered upon the bond.

The act of the 5th of last *April*, which allows the sheriff to plead the prisoner's return before suit, and which does not apply to this case, for the reasons which have been mentioned, does not, however, open the door to the abuses which were met by the decision in the case of *Lansing* ; for the prisoner's bond is now assignable to the creditor, and no such plea can be made to the suit upon the bond. The statute only allows it when the

suit is brought against the sheriff. Hereafter, the creditor, in case of his debtor's escape from the liberties, must take an assignment of the bond; or if he does not choose to confide in the competency of the sureties, he must resort to the sheriff, and take his chance of this plea, and of his being able to meet it. If the sheriff is careful in taking good security, there can be very little danger of abuse of the privilege of the liberties by the debtor; and if the sheriff, by fraud or connivance with the debtor, should avoid taking good security, for the purpose of allowing these escapes and returns before suit brought, he would be chargeable as for a voluntary escape. In the present case, the creditor has elected to sue the sheriff; and he is entitled to recover upon the law as it stood when his right of action accrued, and the defendant must have a stay of execution until he has a reasonable time to resort over to his bond for his indemnity.

The act of the 28th of *March*, 1809, which made these bonds assignable, did not affect the former decision, though it wisely provided a more prompt and desirable remedy for the creditor. It was probably passed in consequence of that decision; for the provisions in the 2d and 3d sections are evidently in affirmance of it. The case of *Tillman* v. *Lansing* must, therefore, apply and govern in other cases not coming within the purview of the act of the 5th *April*, 1810. If the court gave the true exposition of the act of 1801, that exposition must prevail until it ceases to operate, by means of the new statute provision.

I have thus endeavoured to take a full view of every principle that might affect this case, and my opinion is, that the motion for a new trial ought to be denied.

VAN NESS, J. declared himself to be of the same opinion.

Motion denied.