Bland, Chancellor.
This case standing ready for hearing, and the solicitors of the petitioner and the Attorney-General having committed their several arguments to writing, they with the proceedings were read and considered.
In England, as in this instance, jurisdiction is frequently given to the Chancellor by private or special acts of parliament; and in all such cases he adheres strictly to the special authority so given. (b) Here too, the Chancellor has always held himself bound to follow the authority exactly as given to the full extent of the constitutional competency of the General Assembly to confer any such authority. But in this case the solicitors of the petitioner and the Attorney-General differ materially as to the meaning of this resolution.
On the part of the petitioner it is contended, that the Legislature meant, that neither the lapse of time should be relied on as a defence; nor that the technical rules of equity which prevail between individuals should be applied to the case.
On the other hand the Attorney-General insists, that all the substantial principles of equity by which a similar controversy between individuals would be governed, should be applied to this case.
This difference as to the intention of the Legislature, renders it necessary to determine, in the first place, what are the principles by which the Chancellor is to be governed; since it is obvious, that the general complexion of the investigation, as well as the final judgment, must altogether, or very much depend upon the circumstance, from which of those positions he sets out. And, therefore, this preliminary question must be disposed of before the case itself can be considered.
It may be safely assumed, as well settled, that all our governments are, in their nature, delegations of power, that they are trusts exercised for the use and benefit of a sovereign people; and that the governments of the states, though less limited than that of the Union, yet have their general as well as their special limitations. (c) And therefore, it may well be doubted whether the General Assembly of this state can, constitutionally, make any capricious or arbitrary disposition of the money or property of the *97 republic; or can be allowed to indulge their feelings of benevolence in bestowing such property on any one, merely as a generous donation, without regard to any consideration of public good. The discretionary power of the General Assembly, it may be admitted, is and must be extensive; perhaps, beyond control from any other co-ordinate department of the government; but still it must be limited by a sound regard to the general benefit of the people; and therefore, should not be allowed from a mere impulse of kindness to make a gift of the public funds to any one who had rendered no service to the state; nor done any thing that might be considered as a valuable consideration or a public benefaction. (d)
If the unlimited discretionary power of the General Assembly themselves over the public property can be susceptible of question, surely no court of justice should consider itself as having been clothed with any such power by that department, without the most express declaration to that effect. This court must therefore, be extremely guarded how it assumes an authority from the Legislature to dole out the charities, or to cast abroad the bounties of the state. If however, laying aside the rules of law and equity by which the rights of property are regulated, it is to be determined upon principles of general morality, whether or not a petitioner is to be paid from the public treasury any amount he may ask or claim, then the General Assembly must be much better judges of such a matter than the Chancellor, because they are presumed to be, and are in truth, much more intimately acquainted with the feelings and disposition of the people than any single member of the judiciary can be. But I cannot allow myself to believe, that the General Assembly intended to clothe the Chancellor with any such large and unqualified powers. He is directed to decide according to the equity and right of the matter; that is, according to those established rules by which he is governed in similar cases ; *98 not by any variable and uncertain notions of liberality and benevolence.
Prudential and equitable considerations ought always to curb licentious invasions of private right, (e) But the government of this republic by virtue of that eminent domain, which for public purposes is entrusted to all governments, may take the property of any individual and cause it to be applied to the use of the public, on-making him a reasonable compensation. But it cannot arbitrarily take property from one citizen and bestow it upon another; because such an act, although not specially prohibited by the constitution, would be contrary to the fundamental principles of the government itself, (f) If such a transfer of property could not be' openly and directly made, it certainly could not be done covertly or circuitously; and therefore, in any reference of a case to the judiciary, as in this instance, the Legislature could not command a court of justice to stay, or depart from its regular course of proceeding in a particular case; (g) or arbitrarily to assume any fact, not admitted by the party, which would give rise to a legal or equitable principle destructive of the interests of creditors, or of the right of property of such party; because it would be, in effect, and indirectly, to transfer such property from one person to another. (h) Even during the provincial government, when the General Assembly of the province was held to be endowed with a sovereign and unlimited power, similar to that claimed by thd parliament of England, such an assumption of facts and consequent transfer of property, was considered as so dangerous and unjust an act as to call forth a solemn protest from one of the most profound lawyers of his time. (i) Therefore, where the facts have been assumed by the Legislature in their reference of the case to the Chancellor, although he may act upon them, as has been done in some instances, if they should be admitted by the party, or there should be no opposition; yet, without such consent, it might be difficult for him to acquiesce under such an assumption where the rights of a party were materially affected by it. (j)
But as the General Assembly must be allowed to have a large discretionary power over public property and money in the treasury; *99 I should without difficulty yield to any assumption of facts, affecting the rights of the state only, in favour of an individual. And upon the same principles the state may, for itself, waive the benefit of any rules of law or equity which operate in its favour.
As where in a suit instituted in Chancery on a controversy which arose between the intendant and a purchaser of confiscated property, the case was, by a resolution of the General Assembly, directed to be referred to arbitration; (k) and the arbitrators having made an award in which they stated, that their powers, under the resolution, were not sufficiently extensive to enable them to do complete justice, the case was, by another resolution referred to the Chancellor with directions to enquire into the principles upon which the award was founded, and upon consideration of all circumstances to decree as equity and justice might require. (l) Upon which the Chancellor declared, that he considered it to be the meaning of the General Assembly to place him in the room of the arbitrators, whose powers were defective, and to enlarge the submission so that complete justice might be done. And therefore he held, that it would not be consistent with his duty to consider the case in the same light as if the contest were between two individuals coming before him for decision according to the principles established by preceding determinations in Chancery; and he proceeded to dispose of the case accordingly as an arbitrator w’ould have done. (m)
In that instance the state not only admitted the facts in favour of an individual, but also waived all the strict rules of law and equity of w'hich it might have taken advantage; and liberally directed the case to be submitted to arbitration unembarrassed by any forms or rules whatever. The resolution under consideration involving a claim upon property in the hands of the state, although peculiar and special in its nature, must be regarded as a public law of which the courts are bound to take notice. There are, however, many instances in which the Legislature has, by private acts, interposed, without prejudice to any private rights, to remove difficulties and give facilities in the disposition of property in which the state had no interest; by providing modes of leasing, mortgaging or selling legal or equitable estates of deceased persons for the payment of their debts, or to save the more profitable personalty; *100 or so that the property might be made productive for the relief of the necessities of those interested; or to enable infants to convey in pursuance of a will under which they took as devisees. Under such laws the Chancellor proceeds according to the mode prescribed, pursuing the ordinary course of proceeding in aid of such private acts, and only so far as they are silent as to the mode of proceeding and the powers conferred by them may be so executed, and are constitutional. (n)
Here it is perfectly manifest, that the resolution by which this case has been referred to the Chancellor, makes no assumption of facts; nor admits any; nor, on behalf of the state, waives the benefit of the well established principles of law or equity properly applicable to the merits of the case; but on the contrary it calls upon the state’s chief law officer to attend and defend its rights and interests, (o) The case was presented to the General Assembly by petition, accompanied by sundry vouchers and documents; and, in that form, it has been turned over to the Chancellor to adjudicate upon; and hence, discarding the mere forms and modes of proceeding by which controversies are brought before this court, and prepared for final decision and nothing more, the case must be heard and disposed of according to the substantial principles of equity, as if it had been brought here pursuant to the regular course of proceeding. And, consequently, without any reference to the mere forms peculiar to this court, the claim must be considered on its merits; that is, as a common controversy between a creditor and debtor, merely putting the state in the place of the Mollisons; but giving to the creditor every advantage he ought to have, upon the ground that the acts of the state, if any such there be, have embarrassed, postponed, or destroyed his remedy against his debtors, the Mollisons, without affording him another equally efficient.
Proceeding then, to consider this case as one, which like all others, legally submitted to the Chancellor for adjudication, must be governed by the principles of law and equity arising out of the facts of which it is composed, it will be necessary in the first place to gather up all those facts, and exhibit them in their proper order. The case as to facts stands thus :
It appears that William and Robert Mollison, merchants resident in London, were some time before and until about the year 1775, *101 very extensively engaged in trade to this country; that they had five separate stores in Maryland managed by agents; some of whom, without being publicly acknowledged as such, continued to reside here during the revolutionary war; and after the peace of 1783, they had, in this country, several active and openly acknowledged agents, charged with the settlement of their former commercial affairs. That the Mollisons had, so long as they carried on their trade, large consignments of tobacco made to them from time to time by various persons of Maryland; and had debts due to them by a number of persons here, to a very large amount; that they suspended their payments about the year 1776; but some of their creditors received payments on account of claims against them as late as the year 1793.
It further appears, that the late John Hepburn, during his lifetime, had shipped several parcels of tobacco to them; that Hepburn made his will and died some time in the year 1775, in Prince Georges County, leaving Samuel C. Hepburn as his executor, who acted as such accordingly; that the Mollisons, by their letters, admitted themselves to be indebted, on the 1st of April, 1776, to the estate of the late John Hepburn, on account of shipments of tobacco, to the amount of £316 sterling, equal to $1,404 44 of our present legal money; that the executor Samuel C. Hepburn, on the 15th of March, 1776, drew a bill of exchange in favour of Philip Thomas upon the Mollisons for the sum of £260 sterling, directing in the bill itself, that the same should be placed to the account of the estate of John Hepburn, Esq.; for this bill Samuel C. Hepburn received of Thomas good legal money of the time, not continental currency; and Thomas sold and endorsed it to Willing, Morris Sf Co. who had it presented for acceptance, which was refused, and it was protested accordingly; of which the holders, in a letter dated on the 31st of March, 1777, gave notice to Samuel C. Hepburn the drawer, which letter reached him some time in April following. That in an account, altogether in the hand-writing of the executor Samuel C. Hepburn, and purporting to be an account made out by him as executor, there is, among others, one entry in these words: ‘12th January, 1779, by cash received in part of W. fy R. Mollison’s balance, £260 ;’ and another entry, and the last one, is in these words: ‘8th April, 1789, to cash paid S. Hepburn's bill on W. §• R. Mollison, returned protested, £52011s. 3d. common currency.’ That in another account, altogether in the hand-writing of one of the registers of wills of Prince Georges county em~ *102 bracing every item of that in the hand-writing of the executor except the before mentioned last one in it, in which there is, on the debit side, an entry in the following-words : ‘1779, January 12th, with £433 6s. 8d. continental money received of W. R. Mollison for £260 sterling, in part of their balance, is specie at 10 for 1, £43 6s. 8d.’
It further appears, that the whole of the debts due to the Mollisons, with all their property in Maryland, were liable to the operation of the acts of October, 1780, ch. 5 and 45, and the laws subsequently passed in relation to the same subject; that in the year 1782, two special acts of Assembly were passed authorizing Thomas Contee to collect debts due to the Mollisons in this state, to satisfy himself and their other creditors and to pay the residue into the treasury; that on the 13th of September, 1784, the holders of the bill of exchange commenced suit upon it against Philip Thomas the endorser, and having obtained judgment, it was superseded by him, and on the 20th of May, 1786, the drawer, Samuel C. Hepburn, became one of the sureties in the superseder’s bond; which judgment was afterwards on the 16th of June, 1789, fully satisfied by Hepburn. That Samuel C. Hepburn the executor received assignments of debts due to the Mollisons, amounting together to $840 71; one of which assigned debts due from Jonathan Simmonds, having been secured by a bond given to the executor on the 26th of August, 1790, must have been assigned before that time; 'but when does not appear. There is nothing to shew the exact time when any of the assignments were made; from any thing that does appear they might all have been made before the year 1790.
It further appears, that an advertisement was inserted for six weeks in the Annapolis newspapers, in the year 1806, calling on the creditors of the Mollisons to meet their agent to hear propositions respecting claims against them, of which the executor Hepburn had notice; that the executor Samuel C. Hepburn, always resided in Prince Georges county, where he died about the middle or latter end of the year 1806 ; that on the 22d of June, 1821, a bill was filed by the petitioner John M. Hepburn and others, as the representatives of the late John Hepburn, entitled to the residue of his estate; making this claim against the state, and stating, that large sums had been paid into the treasury under the act of October, 1780, ch. 5; out of which they prayed, that the claim might be satisfied; then prayed process against the Mollisons, the trea *103 surer of the state, and sundry others said to be the debtors of the Mollisons, who had paid money into the treasury. None of the defendants answered, and the bill was dismissed by the complainant’s solicitor in open court on the 6th of December, 1821. And finally, that the present petitioner John M. Hepburn was, on the 30th of January, 1826, appointed administrator de bonis non of the late John Hepburn, by the Orphans Court of Washington county, in the District of Columbia, by virtue of which he has been invested with a capacity to sue in this state. (p)
By an order of the House of Delegates, passed on the 18th of December, 1823, this case was referred to the Auditor General; and he, taking the entries and vouchers as they stood, according to their dates and natural import, stated an account by which it appears, that, charging the Mollisons with the whole debt due as of the first of April, 1776, amounting then to £316 sterling, or $1,404 44 of our money, principal, and giving them credit for a payment of £260, or $1,155 56, as of the 12th of January, 1779, and then giving them a further credit for $840 71, the amount of the assignments as of the year 1790, calculating interest both for and against, the estate of the late John Hepburn had been overpaid $7 92. This at first blush seemed to be the plain and natural result of the whole affair.
But it has been urged, that the late Samuel C. Hepburn drew a bill of exchange upon the Mollisons on the 15th of March, 1776, for just the amount of £260, and that the payment of £260 was in truth no more than a credit for the proceeds of the bill of exchange. The whole controversy turns upon this point; whether the bill of the 15th of March, 1776, and the payment, as stated, of the 12lh of January, 1779, are identical. This assertion, that the bill and the entry are the same, places them in direct contradiction to each other. The bill is too explicit, and too well fortified to be impugned in any single particular; and therefore, all the efforts of the petitioner have been directed against the entry to make it conform to the bill; and thus the matter in dispute is still further reduced to the single point as to the truth or falsehood of the entry of the 12th of January, 1779.
That entry, as it stands, purports to be an admission of the receipt by Samuel C. Hepburn of £260, as a payment from the Mollisons, in part of a pre-existing debt due from them. It makes *104 not the slightest allusion to any contingency upon which it was to be considered as a payment or not; it does not intimate, that it was the proceeds of the sale of a bill of exchange, or any thing else, which might or might not be\ deemed a payment, according to circumstances ; but simply affirms the fact of a payment of the specified amount having been made on that day by the debtors to their creditor, and nothing more. It is by no means sufficient, as has been contended, to correct the mere date of the entry, in order to reconcile it with the bill; the whole sense of its language must also be so changed to convey the idea, that it was not merely a payment, but the receipt of the proceeds of the sale of the bill of exchange for the benefit of the testator’s estate, which might eventually be a payment; or by which the estate might be involved in much loss. Nothing of the kind is, however, intimated. To sustain the petitioner on this ground, it is necessary that this entry in its date, sense, and substance should be altered, contradicted, and falsified.
If the petitioner were competent thus to impeach his own evidence, the mistake or untruth should be shewn in the clearest and most satisfactory manner; but here he has offered, for that purpose, nothing more than inferences and plausible conjectures deduced from dates, sameness of amount, and the circumstance, that so many different items of the account could not have belonged to the same date.
As to the improbability of the payment in the year 1779; because of the interruption of all intercourse between this country and England by the war, it will be sufficient to remark, supposing the fact to have been so, that the Mollisons had a very large amount of debts and property in this state, and that at least two of their former agents remained here during the whole war, one of whom, there is reason to believe, from the transactions in relation to the special acts of Assembly of 1782, was certainly faithful and as active as he could be during the time and in the peculiar circumstances.
There is, however, nothing which shews, that Samuel C. Hepburn, the drawer of the bill of exchange, seriously intended it should be considered as a transaction properly and exclusively belonging to the estate of his testator. The bill itself indicates on what fund it was drawn; but nothing more; and there can be no doubt, that the executor intended thus to collect a part of the assets of his testator. But if he had meant it should be considered as *105 altogether an affair of his testator’s estate, he would certainly have so expressed himself; and it was his duty, most distinctly, to set forth that intention, if the facts were so; because, if the bill had been sold above par, the profit, in that case, belonged to the estate of his testator; and upon that ground alone, if it had been returned protested, the estate of the testator could have been made to bear the loss.
To shew, that this bill of exchange was, in truth,'made a part of the affairs of the estate of the late John Hepburn, the petitioner places great reliance on the entry of the 8th of April, 1789. But it must be recollected, that at a very early period, dollars were made a legal tender at six shillings each; (q) which afterwards, in a spirit of rivalship with the other colonies, and to retain the then circulating coin in the country, became current at seven shillings and sixpence each; and that to prevent the evils arising from such fluctuations in the current coin of the colonies, the government of the mother country interposed and directed, that dollars should pass in all of them at six shillings, which was affirmed by the Legislature here; (r) so that although the distinction between legal and current money was still kept up by the habits of the people, accounts of executors and administrators were settled with the courts in legal money at the rate of six shillings to the dollar; (s) even after dollars were, by law, made a legal tender at seven shillings and sixpence, (t) until such accounts were, long afterwards, directed to be stated in dollars and cents, (u) These circumstances gave rise to many mistakes and much perplexity. (w) Whence it became a general habit for executors and administrators, before, and continued to be so for some time after the revolution, to submit their papers and vouchers to the Register of Wills; who made all the proper corrections, and put the account into legal form. (x)
The necessity for this aid from the register was increased at the time this executor Samuel C. Hepburn, proposed to pass his account ; because of the variety of the kinds of current money of which its numerous items were composed, and the peculiar depreciation of some of them, (y) The necessity and importance of *106 this help to the executor is made quite manifest, by comparing the account in his own hand-writing with that in the hand-writing of the register; from which there can be no doubt, that the register’s draft must have been formed from that in Hepburn’s hand-writing, and also from Hepburn’s explanations and additional information.
According to the register’s draft, we have then the entry of the 12th of January, 1779, not only re-affirmed, as to date; but with this additional information, that it was a payment then made in continental money; and the register, having been assured by the executor, that it was so then received, has correctly applied the scale of depreciation of that year to it; (z) which conclusively shews, that there could have been no mistake about it as to date. The registers draft also shews, that the executor could have sustained no loss by the depreciation ; because, as he received, so he paid. But the bill of exchange is shewn to have been drawn and sold early in 1776; and yet, its existence is not noticed in these accounts until the 8th of April, 1789; and then, when it is first brought into view, with all its accumulations of damages and costs, as a charge against the estate, the register excluded it altogether, and most justly; because the estate not having profited by the sale of the bill in 1776, it clearly could not be charged in 1789, with the amount for which it was drawn, much less with the damages and costs occasioned by its protest.
Hence the fair and necessary conclusion is, that the negotiation of this bill of exchange was conducted as a separate concern of Samuel C. Hepburn’s own; and that it was not, in reality, connected in any way with, or taken into any account which he settled and passed as executor. According to this view of the’ subject, which I am satisfied is the correct one, there is no contradiction or mystery; all the entries in the accounts, the bill of exchange, and other circumstances, are perfectly reconciled, and stand well with each other.
But it is a rule of sound sense, as well as of law, universally admitted and applicable to all cases, that no one can be allowed to discredit his own testimony; any more than he can be permitted to contradict himself, or to deny any of his own solemn admissions. To this rule, it is believed, there is no exception. A party may be allowed to urge, that any principle of law whatever is deducible from the facts he produces, but he can in no case be suf *107 fered to' exhibit proof of facts ; and then to prove in any way, that the proof so exhibited by himself is false. In this instance, the petitioner does not merely deduce principles of law from the testimony he exhibits; but the entry of the 12th of January, 1779, is exhibited as a part of his proof, and proves the simple fact of payment ; and then he produces circumstantial evidence to shew, that the entry is untrue ; that there was no payment at that time; nor indeed any payment at all; hut a mere credit for the proceeds of a bill of exchange sold in 1776. This latter proof is utterly incompatible with the first; the one or the other must be false. The entry is, however, a material part of the petitioner’s own proof; he cannot, therefore, be allowed thus to impeach and falsify his own testimony. (a)
But the petitioner blends all the transactions in relation to the bill of exchange, with the accounts of Samuel C. Hepburn, as •executor, and thus attempts not only to falsify an entry in his hand-writing, to shew that no such payment, as there stated, was in fact made; hut he also uses the hill of exchange to swell the debt said to he due from the Mollisons; and so to increase the demand against the state.
The holders of the hill instituted suit upon it against Thomas the endorser, and recovered, according to the act for ascertaining what damages shall be allowed on protested hills of exchange; (b) over and above the principal, with costs of protest and suit, twenty per cent, damages. Samuel C. Hepburn being liable, as drawer, for the whole, he accordingly paid the whole amount. And now the petitioner contends, that those damages and costs must be considered as a part of his claim against the Mollisons and the state. But I know of no rule of law by which the drawee who refuses to accept a bill, even where he has funds in his hands at the time, can be charged with the damages and costs of protest. And if the Mollisons cannot be so charged, then there certainly can be no claim, on that account, against the state, who stands in the place of the Mollisons only, even supposing those damages and costs of protest to have been actually paid out of the estate of the late John Hepburn. Upon Samuel C. Hepburn’s receiving notice of the non-acceptance of the bill, his right to sue, which by drawing it, he might he said to have tacitly consented thus far to suspend, *108 was completely restored; and the express object of giving him notice was to enable him at once to collect his debt, or to draw his effects out of the hands of the Mollisons; which, at the time he received the notice, amounted to $1,404 44, with interest from the first of April, 1776, when the whole debt became due.
Not satisfied with pressing the transaction of the bill of exchange for the purpose of adding to the amount of the demand against the Mollisons and the state, the petitioner attempts to use it as a means of accounting for the long standing of his claim, for more than half a century. The debt became due on the first of April, 1776, and the Mollisons might have been then, or at any time after that, sued for it, in England where they resided, or their effects might have been attached here. But it is urged, that between the years 1779 and 1789, the executor had no claim against the Mollisons-, he having lost it by the sale of the bill of exchange, and it only having been revived in him by his payment of that bill; or in other words, that the drawing of the bill suspended his right to sue until after its being protested he had paid the whole amount on the 16th of June, 1789 ; and thus the lapse of the first thirteen years is happily, though singularly accounted for.
It is, however, clear, that although a bill of exchange may be made payable at any length of time after sight, yet if it be not accepted, suit may be brought against the drawer and endorser before the day of payment arrives ; and the drawer may, on being notified of the non-acceptance, proceed forthwith by suit against the drawee to recover his effects out of his hands, upon which the bill was drawn. It is, therefore, perfectly manifest that the drawing of the bill could not have, in any way, prevented Hepburn from collecting his debt from the Mollisons. It may be admitted, that he was excusable in not proceeding against them until he heard the fate of his bill; but certainly after being notified of its non-acceptance, further indulgence could not have been expected by the Mollisons themselves. And the further delay of the executor cannot but be considered as a great neglect of the interests of the creditors and next of kin of his testator. So far, therefore, from this transaction of the bill of exchange furnishing any reasonable apology for that delay of about thirteen years, the executor can be relieved from the imputation of gross negligence in no other way than by shewing, what I believe to be the truth, that he actually did receive payment, as stated by himself, on the 12th of January, 1779, of £260, and obtained assignments for the balance sometime in or before the year 1790.
*109 Upon the first branch of the case I am of opinion, that there is sufficient evidence to shew that this debt, once due to the estate of the iate John Hepburn, has been long since paid and satisfied by the Mollisons themselves. And I might here safely rest the case; but a sense of duty to the state, and a respect for the apparent sincerity and zeal with which the claim has been pressed by the petitioner, induce me to proceed with the investigation in relation to its being barred by the statutory provision, by which it is said to be embraced, and by the presumption of satisfaction arising from the great lapse of time.
These terms of opposition are founded on the supposition, that there is no direct proof that the debt has been fully paid. And in proceeding upon that supposition, one of three positions must be taken; first, that no partial payment has been made, in which case the presumption of payment must begin to run from the first of April, 1776, when the whole debt became due ; or secondly, that there has been a part payment made of ¿6260, which being in itself an acknowledgment of the debt on the 12th of January, 1779, when it was made, the estimate of the presumption must commence from that day; but if, in the last place, as has been urged, the entry as to the ¿6260 must not be considered as a payment, then there being no payment but that of the assignments in the year 1790, the presumption of satisfaction can only rest on the lapse of time since that period.
It must be recollected, however, that the positive statutory limitation here alluded to, (c) is not like the common statutes for limitation of actions, which allows the party a certain time to sue, after his right has accrued, but it specifies the first of September, 1787, as the day, after which no claims of the kind described therein shall be made against the state; and consequently, if that limitation embraces this case, this claim, as against the state at least, has been precluded and barred from that time. From the nature of this case, this positive limitation, and the presumption of satisfaction may, with convenience, be considered together, and I shall, therefore, so consider them.
I have shewn that it must have been the intention of the General Assembly, in referring this case to the Chancellor, that he should be governed by those substantial principles of equity applicable to all similar controversies; and that the mere forms of proceeding, *110 and technicalities peculiar to the course of this court, and nothing more, were to be put aside. But it is asked on the part of the petitionér, in reference to the statute of limitations and the lapse of years relied on as a defence on behalf of the state; why this shew of justice and liberality, if the technical presumption arising from the lapse of time, of which the Legislature were fully advised, was to be' relied on as á bar ?
But as I have said upon a former occasion, in this, as in all other cases, it must strike, every one, that the lapse of years cannot fail to give rise to an unanswerable presumption against the validity of an antiquated claim of any kind, however much it may have been originally a favourite of the law, as in cases of dower or the like. I cannot think it a reasonable demand on the court, to give parties the advantage of a stale and antiquated claim, to suffer them to make the court the depository of their slumbering rights; and then to come and revive them, when, from lapse of time, it is become utterly impossible to ascend to the whole justice of the case. There is surely a principle of limitation in the administration of every system of jurisprudence, to be derived out of the nature of things, which does entitle the court to avail itself of the universal maxim, vigilantibus non dormientibus subveniunt leges. (d) The maxims which refer to descents, discontinuances, ■non-claims, and collateral warranties; are only the wise arts and inventions of the law, to quiet possessions and strengthen the rights of property, (e) And in England it has been generally thought, that sixty years, the limitation to writs of right, is too long a time for titles to remain in dubio; and it has often been lamented there, by eminent lawyers, that the period had not been shortened. (f)
It is true that a mere formal plea of the statute of limitations has been, in some cases, said by courts of common law, not to be a plea to the merits. But a reliance upon the presumption arising from a great lapse of time has never been considered in Chancery as a defence of the same rigid and technical character. The statute of limitations, in equity as at law, must always be pleaded or specially relied on as a defence; but a presumption founded on a long lapse of time is a defence, which has always been allowed *111 to be made at the hearing, or trial as a matter of substance arising out of the whole case; and which it was not necessary specially to advance, and rely on in any previous stage of the proceedings, to enable the party to have the benefit of it. Because, independently of all positive enactments, there must be a period of time after which every latent, or inactive claim to property must be presumed to have been radically defective in its origin, or to have been, in some one way or other completely satisfied. It is asking too much, to require, amidst the mutations of human affairs, and the perishable nature of all things, that the evidences of the right of property should be carefully preserved through a long and indefinite period of time. (g) A presumption of right and of the correctness of a state of things sanctioned by a long series of years is necessary to the peace of society. (h)
The rule, nullum tempus occurist rigi, even in favour of the crown in England, has been as to many cases abolished, or overruled. (i) In Maryland, the Lord Proprietary was always held to be bound by the statute of limitations; (j) and the republic, since the revolution, has not only never, in any case, that I know of, claimed an exemption from it; but has expressly subjected her rights to its operation under circumstances where the propriety of doing so might well have been questioned. (k) The republic, in this instance, claims the application of no rule to which she herself is unwilling to submit; (l) and therefore, may well rely upon a presumption which is necessary to the peace of all, and which forms an important and essential principle in every code of jurisprudence.
On behalf of the petitioner it is contended, that the presumption, as urged against him, is deduced from the state of facts ordinarily existing between individuals, enjoying the common facilities of intercourse, where the creditor is in a condition to demand the payment of his claim, and the debtor is liable to legal coercion for *112 the purpose of satisfying that demand. It is a presumption, that the debt has been paid, arising from the failure to take any steps to obtain the payment. The rule which establishes the presumption, therefore, assumes the fact, that such a state of things existed as would have enabled the creditor to make these efforts, and might have rendered them available to him.
Upon these general principles the petitioner endeavours to shelter himself from the force of the presumption by shewing, that his predecessor, on whom the duty to collect this debt had devolved, was, by the revolutionary struggle of our country, thrown into the midst of a new and extraordinary state of things; that his debtors were cast out as alien enemies, and their property confiscated, or so situated, or so disposed of, that he knew not where to find it, or how to make it available toward the satisfaction of his claim.
The presumption of satisfaction arising from lapse of time, relied on as a defence against this claim, is a deduction from two facts which it assumes to be true; first, that the creditor always had an efficient remedy for the recovery of his debt; and secondly, that there always was property of the debtor, known to the creditor, within reach of his remedy, fully sufficient for the satisfaction of his claim'. (m) If these facts are shewn to be true the presumption of satisfaction follows as an irresistible deduction from them; because, it cannot be believed, that a creditor who had the power and the means of obtaining satisfaction would so long neglect the recovery of his right.
This creditor complains, that his remedies have been impaired or destroyed by the law of confiscation and forfeiture which were enforced by the state against his debtor; by the war, during which his debtors were alien enemies; and by his debtors being foreigners resident abroad. And in the next place, even supposing his remedies to have been in their nature efficient, and in no way impaired, that he knew of no debts or property of his debtor which could have been brought within reach of those remedies. These are the positions to be examined; and the examination of them will necessarily exhibit the bearing which the positive statute of limitations has upon this case.
By the law of England a person convicted of treason or felony forfeited his estate; and all his property, including debts due to *113 him, were confiscated and carried into the public treasury. And in like manner when any one died intestate without heirs or next of kin capable of taking after him, his real and personal estate escheated to the lord, or vested in the king, who, necessarily, for the public peace and to prevent confusion, succeeded to the property as a vacant possession. And where in such case the lands were not, according to the feudal system, holden of any intermediate lord, they escheated to the king; and, under his authority, might be sold and the proceeds taken into the public treasury. When property was forfeited, because of the treason or felony of its owner, by the ancient law of England, the creditors, except those who had incumbrances upon the realty, were left quite without remedy; but in Scotland, it was otherwise, there the public took the forfeited estate, subject to all charges upon it. (n) But by the more modern law of England, the creditors of a traitor or felon are paid to the extent of his forfeited property; and for that purpose the king waives bis prerogative and authorizes an administrator to be appointed, who is held liable to the creditors, as in all similar cases, so far as the assets will go. (o) And where lands escheat for wrant of heirs, the lord or the king, takes them subject to all incumbrances and claims for the satisfaction of which they were bound as the assets of the deceased; and where the king succeeds to the personal estate of the deceased, because of his leaving no next of kin, the king takes subject to the claims of the creditors of the deceased; and the personalty is put into the hands of an administrator accordingly. (p)
In Maryland, under the provincial government, the same rules and practice prevailed; as where the deceased had been found upon an inquest to be a felo de se, the forfeiture was released for the benefit of his widow and children. And where certain property, on the death of the owner intestate, had escheated for want of heirs, the Lord Proprietary took the estate subject to all claims against the deceased, and his creditors were paid as from such an amount of assets. Relief was obtained in such case by petition *114 to the Lord Proprietary in Council, where the case was regularly heard, investigated, and disposed of as justice required. (q)
Hence it appears, that in Maryland as well as in England, where the property of a debtor was in any way, either because of his crimes, or of his death intestate without heirs or next of kin confiscated, escheated, or taken into the public treasury, his creditors were always paid; and that they were not left without remedy for the recovery of their claims. I am aware, that, from the language used in such cases, the relief appears to have been granted as a matter of grace; but it was a favour so imperiously dictated by the public opinion of the age, and the irresistible justice of the claims of creditors, that what thus appears to have been glossed over as a courtesy was, in truth, well understood, long before our revolution, to have ripened into law and right; although no compulsion, under such circumstances, could have been used against the province any more than against the state now.
It is obvious, therefore, that if the property of the Mollisons had been taken into the treasury, according to the law as in force and practice when the debt became due, and before the passage of the confiscation acts, Hepburn would have had a well established and effectual remedy for the recovery of his claim; a remedy of which he would have been bound to take notice, and one substantially similar to, and altogether as effectual as that given him against the administrator of his deceased debtor; because in such case the state would have taken upon itself to stand as the administrator for the benefit of creditors of the property of the debtor whose estate it held. But it having been declared, that there ought to be no forfeiture, except only on attainder of murder or treason; (r) and provided by law, that no conviction should work a corruption of blood or forfeiture of estate. (s) The whole of this learning in relation to confiscation may be regarded as now; and, it is to be hoped, forever entirely obsolete.
The first of our revolutionary confiscation acts, as appears by the marginal notes to most of the acts of the same session, was *115 not passed until the second day of February, 1781, although it is referred to as October, 1780, ch. 45. The enactments upon this subject are numerous, running through a series of several years, and embracing a great variety of matter. But in regard to this case, they need only to be considered so far as they have a bearing upon the means which, but for them, Hepburn would have had, or which they gave him of recovering his claim due from the Mollisons. That they changed his remedies, in some respects, is clear; but did they not give him others as effectual as those which they virtually destroyed ? And did they place in obscurity, or remove beyond his reach, any part of the estate of his debtors against which he might before have had recourse? These are the only questions.
It is admitted on all hands, that the Mollis ons, who were then living, were not brought within the scope of those laws, as traitors ; and therefore, none of their provisions which relate peculiarly to forfeitures for treason, or to escheated estates, apply to their case. They and their property were affected by those laws only and exclusively as being then British subjects and alien enemies.
By the act of October, 1780, ch. 45, it is declared, that all the property within this state, debts only excepted, belonging to British subjects, such as the Mollisons then were, should be confiscated. But it was also declared, by the same act, that all citizens of this state, such as Hepburn then was, should be fully paid and indemnified, so far as their British debtors were solvent, out of the property confiscated; to be adjusted by the General Assembly: Provided, such British debtors had not debts due to them within this state sufficient to satisfy their creditors. Thus requiring the creditors to exhaust that fund first before they made claim against the confiscated property taken into the treasury. Commissioners were appointed to preserve the property so confiscated, (t) who were authorized to receive claims and report to the treasurer as to the probable amount due to creditors from persons whose property had been confiscated; and the treasurer was directed to reserve a sufficiency to meet such claims until the General Assembly should take order therein. (u)
The time for bringing in claims against the state, which arose on any account before the tenth of January, 1785, was limited to *116 a specified period; (w) and it was declared, that all claims against the state on account of property confiscated, which arose before the time limited bylaw for bringing them in, might be brought in, passed, and settled by the Auditor-General on or before the first day of September, 1787, and when so settled should be paid as directed by law: Provided, that the claimant satisfied the Auditor-General, that for want of notice, or for some unavoidable impediment, he could not bring in his claim within the time limited by law. (x) And it was further declared, that no such claim should be passed unless satisfactory proof was given that there were no debts due in the country to the persons whose property had been confiscated, to satisfy the claim exhibited against the state, and that due industry had been used by the claimant to discover the debts subject to attachment, and the proper means taken by him to secure his claim out of such debts. And in conclusion it was directed, that the Auditor-Gen eral should give notice of this act in such manner as he might think proper to communicate its contents throughout the state. (y) It was also provided, that when any claim of a creditor against confiscated property should be rejected by the Auditor-General, the claimant might lay his papers before the Chancellor, who was authorized to make up an issue upon the case, and send it for trial before a jury. (z) And, as if to leave the door wide open for any citizen to come in and obtain a judicial decision upon a claim of any kind which he might have against the state, any claimant was allowed, in the manner prescribed, to commence and prosecute an action at law against the state; (a) which law remained in force until within a short time past. (b)
The confiscation acts divested the Mollisons of all their property, debts only excepted, upon the ground that they were alien enemies; and, consequently, those very acts, as to all such property, virtually declared them to be civilly dead. The question then arises, how far did those laws really impede or embarrass Hepburn in the collection of his debt ? It must be admitted, that but for the confiscation of the property of the Mollisons, Hepburn might, by an attachment, have taken any part of it, real or personal, as well as their debts, in satisfaction of his claim. But the *117 confiscation acts allowed him to come in and have his claim passed by the commissioners, or the Auditor-General; and so far, therefore, his remedy was changed without being impaired.
In regard to this change of remedies, it is evident that the confiscation acts considered the Mollisons as deceased debtors, and the state as their trustee for the benefit of their creditors, citizens of this country; and as administering their assets according to the principles of equity. Upon a creditor’s bill, in this court, all the assets of the deceased debtor are made subject to the payment of his debts, so that the personalty, or natural fund may, at the instance and for the benefit of the heirs and devisees, be first applied. And all his creditors are called in, by a general notice; and their claims, on being proved and adjusted, are ordered to be paid from the proceeds of the sale of the estate. If any claims are not brought in before a distribution is actually made, they are excluded from any satisfaction in that case. Such is the course of administering the estate of a deceased debtor in Chancery, (c) The course of proceeding prescribed by the confiscation acts, is strikingly analogous to it; those acts requiring that the creditors should endeavour first to obtain satisfaction from the debts due to their debtor in this state; and on there being no such debts, that their claims against the property taken by the state, should be exhibited within a limited time, or be excluded; and should be legally proved, if required, to the satisfaction of a jury.
Considering the actual situation of the Mollisons, and the whole subject in this point of view, it is manifest that Hepburn’s remedy for the recovery of his debt, was in no manner whatever materially impaired or obstructed; that although in some respects different, it was as effectual as ever it had been; and although changed, it was altered not merely by one public act of Assembly, of which every one was bound to take notice; but by a whole system of public acts altogether in affirmance of the ancient pre-existing principles of confiscation as regards debtor and creditor; and of a character so important and interesting to the people at large, that Hepburn could not fail to have been actually well acquainted with them and all their provisions involving his interests.
Looking to those remedies, by some of which Hepburn might certainly have obtained payment of his claim against the Mollisons, if it had not been previously satisfied; I might here safely *118 rest the rejection of it upon this peculiar act of limitation, by which it was in the clearest terms designated, and finally excluded as a claim against the state on account of property confiscated, which had not been brought in and passed by the Auditor-General, on or before the first day of September, 1787. (d) But, as it is fit that the whole ground upon which the state rests its defence against this claim, should be fully laid open, I shall proceed.
It is clear then, that this creditor lost nothing by the operation of the confiscation acts; they placed none of the funds of his debtors beyond his reach; nor did they leave him without the most effectual remedies by which he might have made those funds available. And consequently, nothing can be found in those acts, that will afford the slightest protection to his claim against the full force of the presumption of satisfaction, arising from the great lapse of time since it became due. But suppose no such confiscation acts had been passed, then the Mollisons must be considered, prior to the 4th of July, 1776, as British merchants resident beyond the jurisdiction of this state ; after that time, until the peace of 1783, as alien enemies; (e) and thenceforward as alien friends resident abroad; who during all that time had property within the jurisdiction of this state. Then it may be asked, would Hepburn have been without remedy, or would any of his legal remedies for the recovery of his debt have been impaired or destroyed by the intervening war or other circumstances ?
The case of a debtor resident abroad, who has property remaining in the country of his creditor, is a common one, which must frequently occur every where; and a code of laws, that gave no adequate remedy to the creditor, in such case, would be mainly defective. The name of the process, or the form of the proceeding, is of no importance, so that relief can be obtained by it. In the English books the London foreign attachment is said to be a mode whereby the goods and debts of a foreigner in some liberty may be taken to satisfy his creditors within such liberty, (f) And outlawry in civil actions is considered as in nature of civil process to compel an appearance to the suit; or after judgment to procure satisfaction. The forfeiture, though nominally to the king, in truth goes to the plaintiff towards payment of his demand. If the outlaw appears, pays all the costs, puts in sufficient bail, and does *119 every thing he can to put the plaintiff in as good a condition as he would have been in originally; or if after judgment the outlaw pays the debt and costs, the court reverses the outlawry upon motion without any writ of error, (g) These are the special and general modes of proceeding, according to the English law. And it is now settled, that a creditor may, in cases falling within the jurisdiction of the admiralty, proceed to obtain satisfaction from his debtor resident abroad, by attaching his property in this country, (h)
The mode of proceeding by attachment to obtain satisfaction from property found here belonging to a non-resident debtor, was certainly established in Maryland as early as 1647, if not before, (i) The acts of Assembly in relation to it have been always considered as laws regulating process for the more effectual recovery of debts, or as providing a special auxiliary remedy for the recovery of debts. (j) An attachment has always been considered, from its very nature, as intended solely for the benefit of our citizens; before the revolution a person not an inhabitant of the province could not sue out the process; nor can an alien now have it; (k) though an inhabitant of this or any other state or territory of the Union may sue it out. (l) It is intended to enforce the payment of debts only; it will therefore lie on a judgment, bond, note, account, or the like; but not on a covenant, bond with collateral condition, for trespass, &c. (m) It maybe levied on any lands and tenements, goods and chattels, rights and credits of the defendant, that can be found in or out of the hands of others, or in the plaintiff’s own hands; or it may he levied on an equitable interest in real estate; (n) on a vested interest in any property; on a debt due by judgment; (o) on a debt before it is due; or on any thing that may be taken in execution. (p) And in general, the garnishee may plead all things in defence that the defendant might have pleaded. (q)
One of the most accomplished of the lawyers of Maryland, be *120 fore the revolution, gave it as his opinion, which has been virtually sustained by adjudications subsequent thereto, that under the provincial government, and of course since, the property of British merchants here has been, and is understood to be a depositum or peculiar security for the payment of country creditors; to the extent therefore of such properly credit is given here without inquiry into the circumstances of the merchant elsewhere; and on these considerations our attachment act and practice have been founded; thus intimating, as the fact is, that the proceeding by attachment is founded as well upon the custom of the country as upon legislative enactments. (r)
Hence it appears, that this creditor might have obtained satisfaction from the property of the Mollisons in Maryland, by attachment ; that it was his only remedy; and one which had been most emphatically framed to suit such cases as his, and was eminently calculated to afford the most effectual relief to country creditors against British debtors.
There can be no doubt, that Hephurn might have proceeded by attachment at any time during peace; but it is said, that the revolutionary war had commenced before this debt became due; and, that, from the 4th of July, 1776, to the peace of 1783, the Mollisons were alien enemies. It is now, however, universally admitted, that an alien enemy, resident in the country, may sue and be sued; and further, that the remedies on private contracts for the recovery of debts are not forever barred, but merely suspended by a war between the nations of the creditor and debtor. The only reason why a non-resident alien enemy is not allowed to sue is, that he should not be permitted to recover property and take it out of the country, so as thereby to strengthen the enemy. (s)
But this reason in no way applies to the case of a citizen creditor, suing by attachment to obtain satisfaction from a non-resident alien enemy debtor. In such case, our own citizen by making the property so available to the satisfaction of his own debt, does so far strengthen our own country at the expense of the enemy, (t) The disability of an alien enemy to sue is so extended as to prevent him from gaining any advantage for himself and his country; and, therefore, he is not only disabled from suing for the purpose *121 of procuring any immediate relief; but he is not allowed to obtain testimony by a bill of discovery in equity, so as thereby to lay a foundation for obtaining relief elsewhere, that is, by attachment or otherwise from the property of our citizens in the alien’s own country or elsewhere. (u)
It is clear then, upon principle, that there wras nothing in the circumstances of the Mollisons having been non-resident alien enemies by which the remedy of their creditor Hepburn could have been in any degree affected. Hepburn might have proceeded by attachment at any time after his debt became due on the first of April, 1776, except within that short period during which, by the course of the revolution, the courts of justice were closed; and which it was declared should not be considered as a part of the time limited for bringing any action. (w)
But apart from the general principles of law in relation to this matter, it appears from the docket entries of the late General Court, that there were several attachments actually laid in the hands of Mollison’s debtors during the war and before the peace of 1783 ; and besides, Hepburn’s right to proceed by attachment against the property of the Mollisons here, at the time they were non-resident alien enemies, has been repeatedly recognized and affirmed in express terms by the confiscation acts themselves, already noticed, as well as by those I shall now proceed to consider.
The act of October, 1780, ch. 5, s. 11, is in many respects an enactment of a very unusual and equivocal character. It authorized debtors of British subjects, such as the Mollisons then were, upon certain conditions and under certain regulations to pay the debts so due from them into the treasury. And many debts were so paid in accordingly. Upon which it afterwards became the subject of much litigation in the courts of justice, and of long negotiation between the two nations to determine in what light those payments were to he considered as between those debtors and their creditors. It was finally determined, that as between them, such payments into the treasury were not to be deemed a satisfaction of those debts in any way. (x) And, in consequence *122 of that final determination, Maryland, by sundry resolutions, authorized the debtors to withdraw the amounts paid by them, respectively. (y) But all that relates to this view of the subject of this enactment is entirely foreign to the matter now under consideration.
This eleventh section of the act of October, 1780, ch. 5, applied to nothing but the debts due to the Mollisons from the citizens of Maryland ; under which it appears, that some of their debtors actually made payments into the treasury during the year 1781, to the amount of about $9,000; and the acts of April, 1782, ch. 46, and November, 1782, ch. 18, which, as it would seem, have been erroneously treated as private acts, after reciting that Thomas Contee had been the factor and agent of the Mollisons, clothes him with full power to collect all debts due to them, for the benefit of their creditors, and to pay into the public treasury the balance by him collected. These special acts were, soon after the peace of 1783, repealed, (z)
But the general law of 1780, as well as these special acts of 1782, without at all affecting any remedy which Hepburn had against the Mollisons’ personalty, or any other portions of their property, did in the most explicit terms preserve, and even improve all his remedies against their debts which were the subject of those enactments. For, it is expressly declared by the general law, that all sums of money so paid into the treasury should be ‘liable to the attachment of creditorsand it is positively provided by the special acts, that nothing therein contained should affect the creditor’s right to proceed by attachment. Hepburn, as a creditor of the Mollisons, could have reached their debts, for the purpose of obtaining satisfaction of his own claim, in no other mode than by an attachment, making their debtors garnishees; and here it is distinctly declared, that the state may, in effect, be made a garnishee under certain circumstances, in place of the debtors. So far then the direction of the remedy was changed; but it was, in fact, thereby much improved; because, it was more easy to ascertain whether the state held any thing, and how much, than any individual who might be summoned as garnishee. (a)
It was declared, that no book, papers, or evidences of debts due to British subjects, such as the Mollisons then were, should be *123 taken out of the country; but, in the absence of a resident citizen agent should be deposited with the treasurer of the state. (b) And it was further provided, that the factors of British creditors should not collect and remit debts due to them until they had lodged with the auditor a list of all balances due to such creditors, and given bond to satisfy the citizen creditors of those British creditors, (c) Thus preserving, for the benefit of citizen creditors, the vouchers, and the funds within their reach so as to enable them to levy their attachments with more certainty and effect.
From these various views of the subject it clearly appears, that all Hepburn’s remedies for the recovery of the debt he alleges to be due to him from the Mollisons were preserved in the most effectual form by the confiscation acts. And, that, supposing those acts out of the question, there was nothing in the war ; or in the circumstances, or situation of the Mollisons, that could, in the slightest degree, affect his remedies; and therefore, there is nothing under which his claim can take shelter from the presumption against it; unless it may be found in the last position assumed by him; which is, that there were, in fact, no debts due to the Mollisons which he could have attached, or if there were, that he was wholly ignorant of there being any such debts; and also of the fact of any property of theirs having been actually confiscated and taken into the public treasury.
It appears from the various documents and vouchers produced by the petitioner himself, that the Mollisons were English merchants resident in London, engaged very extensively in trade to this country; that they had, in Maryland, a store at Georgetown, another at Bladensbarg, a third at Pamunky, in Charles county, a fourth at Pig point, and a fifth at Huntingtown, in Calvert county; that they received from various persons in Maryland large consignments of tobacco; and, amongst others, that this debt now claimed originated in that way; that their trade was continued to about the year 1775; that they had debts due to them, from debtors dispersed over the whole of the then settled portion of the Western Shore of Maryland, to the amount of about ¿£'17,000 sterling; about £13,000 of which is represented to have been due from persons who were solvent at or after the peace; and that Samuel C. Hepburn, the executor of the late creditor, at the time, and for many years after, resided in Prince Georges county, about mid-way between those *124 several stores; and, as it would seem, in the midst of the Maryland debtors of the Mollisons.
But it has been urged, that this creditor Samvel C. Hepburn had no knowledge of the fact, that any portion of the property of the Mollisons had been confiscated and taken into the treasury. The records of the treasury must certainly shew what has been at any time past, received into it from every source as well as from the ordinary one of taxation; they are public and open to the inspection and use of every one at all interested in any fund, that may have been carried into it. And it is a well known historical fact, that the system of the revolutionary confiscation laws, from the time of the passage of the first of them, and for many years after, agitated, interested and engaged the attention of the people of Maryland more intensely than any other set of laws, that ever were passed by their representatives. With regard to the Mollisons in particular it appears, in addition to what has been already stated, that a large amount of their property, which had been confiscated, was publicly advertised for sale, and sold at auction on the 20th of October, 1783, and the proceeds paid into the treasury; out of which one of their creditors, it appears, was ordered by the Legislature to be satisfied, on the ground of .its being then, 1805, shewn, that there were at that time no debts due to them. (d)
From all these circumstances, it is but fair to presume, and I cannot withhold my belief of the fact, that Samuel C. Hepburn did know, or might, by any reasonable degree of diligence have informed himself, of an amount of those debts of the Mollisons abundantly sufficient to satisfy his claim. But apart from those funds; and if he actually did not know of any of them, and after using due industry, had failed to discover any of them, then he would have so laid that foundation, upon which to claim satisfaction out of the proceeds of the confiscated property of the Mollisons which had been taken into the treasury, (e) And finally, having failed in every particular; either to shew a want of remedy; or a want of funds, or an ignorance of funds against which his remedy might have been directed, his claim is left exposed to the whole force of the presumption against it arising from lapse of time, by which it is completely covered and extinguished.
Upon the whole then, it is my opinion, in the first place, that there is evidence sufficient to shew7, that this claim was actually *125 paid by the Mollisons themselves; in the next place, that it has been justly and absolutely barred and excluded by the special act of limitations; (f) and in the last place, that the great lapse of time since it became due, without the delay being in any manner reasonably accounted for, gives rise to a presumption, altogether irresistible, that it must have been in some way or other, fully and completely paid and satisfied.
Whereupon it is Decreed, that the claim of the said John M. Hepburn, as administrator de bonis non, of the late John Hepburn, against the State of Maryland, on account of the confiscated property of William and Robert Mollison, is utterly unfounded and unjust; and that the petition of the said John M. Hepburn, be, and the same is hereby dismissed. And it is further Ordered, that the register be, and he is hereby authorized and required to lake charge of and safely file and keep among the records of this court all the papers, documents, and vouchers heretofore exhibited or filed in relation to the said claim, subject to the further order of the General Assembly; and to give copies of all or any of the same, and of this decree, on being paid the fees allowed by law in similar cases.

 2 Mad. Chan. 719; Mitf. Plea. 31.

 Calder v. Bull, 3 Dall. 386.

 3 Secret Jour. Cong. 197; 1784 ch. 37, s. 7 ; 1788, ch. 44, s. 20. Construction construed, by John Taylor, of Caroline, 261.
‘We, (Congress,) are not the almoners of the American people, the dispensers of their charity, but agents, with limited powers, entrusted with the control of the public purse, for the sole purpose of applying it to the current exigencies of the government, in the advancement of great principles of public policy connected with the exercise of powers substantively conferred upon us, and in the discharge of individual claims arising from our own, or the engagements of our predecessors.’ Speech of Mr. Berrien, a Senator of Georgia, in the Senate of the U. States, 30tk January, 1828. — National Intelligencer, 19lh Jlpril, 1828,

 3 Secret Jour. Cong. 193.

 The Federalist, No. 44; Trustees of the University v. Foy, 2 Hayw. 310, 374; Dash v.Van Kleeck, 7 John. 477.

 1827, ch. 141.

 Satterlee v. Matthewson, 2 Peter. 380.

 Partridge v.Dorsey, 3 H. & J. 307, note.

 May v. May, Buller N. P. 112 ; Campbell’s case, 2 Bland, 230.

 Resolution. 1784, No. 4.

 Resolution 24th May, 1787.

 Garretson v. The Attorney-General, 18th August, 1790; Chancery Proceedings, lib. D.fol. 385.

 Cambells, 2 Bland, 230; Williams’ ease, post; Hughes’ case, 1 Bland, 46; Iglehart v. Armiger, 1 Bland, 520.

 3 Blac. Com. 256 ; Mitf. Plea. 33.

 1813, ch. 165.

 1636, ch. 4.

 Royal Proclam. 18 June, 1704, 6 Anne, c. 30 ; 1708, ch. 4; dial. Pol. Ann. 367.

 Dep. Com. Gui. 20, 41.

 June, 1780, ch. 8, s. 19 ; November, 1781, ch. 16.

 1798, ch. 101, sub ch. 6, s. 5.

 Parker v. Mackall, 2 Bland, 66, note; Woodward v. Chapman, 2 Bland, 69, note.

 Dep. Com. Gui, 20.

 The Chancellor's case, 1 Bland, 635.

 May, 1781, ch. 17, s. 2; The Chancellor’s case, 1 Bland, 635.

 Fen ton v. Hughes, 7 Ves. 290; Purcell v. McNamara, 8 Ves. 327; 1 Brown Civil Law, 478; Queen v. The State, 5 H.&.T. 232.

 1715, ch. 7 ; 1785, ch. 38.

 1786, ch. 18.

 The Rebecca, 5 Rob. Adm. Rep. 104.

 Dudley v. Dudley, Prec. Cha. 249.

 Gilb. Exeu. 12; Chariwood v. Morgan, 1 New Rep. 66; Stackhouse v. Barnston, 10 Ves. 469.

 Shipbrooke v. Hinchingbrook, 13 Ves. 396.

 Sherman v. Sherman, 2 Vern. 276; Prince v. Heylin, l Atk. 494; Sturt v. Mellish, 2 Atk. 610; Smith v. Clay, 3 Bro. C. C. 639, note; Hercy v. Dinwoody, 4 Bro. C. C. 258; Cholmondeley v. Clinton, 2 Jac. & Walk. 140 ; Stevenson v. Howard, 3 H. & J. 554; Hillary v. Waller, 12 Ves.265.

 Co. Litt. 119, n. 1; Com. Dig. til. Prerogative, (D. 86 ;) Bac. Abr. tit. Prerogative, E. 6; 3 Blac. Com. 307; The Attorney-General v. Richards, 2 Anstr. 615; Simpson v. Gutteridge, 1 Mad. Rep. 610; Roe v. Ireland, 11 East. 280 ; Goodtitle v. Baldwin, 11 East. 488; Nimmo v. The Commonwealth, 4 Hen. & Mun. 70 ; The Mayor of Hull v. Horner, Cowp. 108.

 Kelly v. Greenfield, 2 H. & McH. 138.

 1818, ch. 90 ; 1839, ch. 34.

 Cockey v. Smith, 3 H. & J. 26.

 Hillary v. Waller, 12 Ves. 266; Fladong v. Winter, 19 Ves. 196; The Mayor of Hull v. Horner, Cowp. 109.

 Bedford v. Coke, 2 Ves. 117; Burgess v. Wheate, 1 Eden, 203; Cuddon v. Hubert, 10 Cond. Cha. Rep. 160.

 Megit v. Johnson, 1 Doug. 542.

 Manning v. Napp, l Salk. 37; Jones v. Goodchild, 3 P. Will. 33; Burgess v. Wheate, 1 Eden, 177; Middleton v. Spicer, 1 Bro. C. C. 202; Barclay v. Russell, 3 Ves. 436; l Will. Exrs. 259.

 Robert Fuller’s case, 14 May, 1680, A and Records, lib. C. B. 45; John Webster’s case, 27 November, 1680, Land Records, lib. C. B. 60, 102 ; Richard Russell’s case, 7 May, 1681, Land Records, lib. C. B. 96, 144, 150, and 166.

 Decla. of Rights, art. 4. Peter Shuman having been convicted of treason, and executed in the year 1781, the General Assembly released the right of the state to his real and personal estate, and vested the whole in his widow and eleven children, 1796, ch. 16.

 1809, ch. 138, s. 10.

 October, 1780, ch. 49.

 May, 1781, ch. 23, s. 19.

 1784, ch. 45, and 1785, ch. 10.

 1786, ch. 18.

 1786, ch. 18; Journ. Cong. 23d July, 1787; 27th August, 1786.

 1786, ch. 49, s. 4.

 1786, ch. 53

1820, ch. 210.

 Hammond v. Hammond, 2 Bland, 307; Tessier v. Wyse, ante 28.

 1786, ch. 18.

 Barclay v. Russell, 3 Ves. 433.

 Jacobs’ Law Dict. v. Foreign Attachment.

 Rex v. Wilkes, 4 Burr, 2549; Morley v. Strombom, 3 Bos. and Pul. 254; Tidd Prac. 109, 135; Davis v. Davis, 2 Atk. 23 ; Edgell v. Haywood, 3 Atk. 356.

 Mamo v. Almeida, 10 Wheat. 473.

 Campbell v. Morris, 3 H. & McH. 555.

 Campbell v. Morris, 3 H. & McH. 555 ; Davidson v. Beatty, 3 H. & McH. 616; Barney v. Patterson, 6 H. & J. 201.

 Burk v. M’Clain, 1 H. & McH. 236; Yerby v. Lackland, 6 H. & J. 453.

 1825, ch. 114.

 The State v. Beall, 3 H. & McH. 347.

 Campbell v. Morris, 3 H. & McH. 537.

 Or now by decree, 1831, ch. 321.

 Wells v. Gheselin, 1 H. & McH. 91; 1832, ch. 307.

g) Masters v. Lewis, 1 Ld. Raym. 56; M’Daniel v. Hughes, 3 East. 367; Chase v. Manhardt, 1 Bland, 344.

 Burk v. M’Clain, 1 H. & McH. 236.

 Vattel, b. 3, s. 77; Clarke v. Morey, 10 John. Rep. 70; Buchanan v. Curry, 19 John. Rep. 137.

 Willis v. Pearce, 6 H. & J. 191, note.

 Daubigny v. Davallon, 2 Anstr. 463 ; Albretch v. Sussmann, 2 Ves. & B. 323.

 February,1777, ch. 15, s. 7.

 Dulany v. Wells, 3 H. & McH. 20 ; The State of Georgia v. Brailsford, 3 Dall. 1; Ware v. Hylton, 3 Dall. 199; The Commonwealth v. Walker, 1 Hen. Sc Mun. 144; 4 Secret .lour. Cong. 206; 6 Southern Review, 498.

 Resol. 1797, No. 14 and 15; Resol. 1798, No. 30; 4 Secret Jour. Cong. 200.

 1784, ch. 74.

 Ware v. Hylton, 3 Dall. 268.

 October, 1780, ch. 45, s. 10.

 1786, ch. 49.

 Resol. 1805, No. 20.

 1786, ch. 18.

 1786, ch. 18.