## NEGRO BEN. JONES *vs.* EDWARD WOOTTEN.

The issue of manumitted slaves born *after* the manumission but *before* the period of its taking full effect were slaves for life before the act of 1810.

That act not to have a retroactive effect, though declaratory in its terms.

It is not competent to the Legislature to *declare* what the law has been, or is; that belongs to the courts.

Statutes are to be construed consistently with the fundamental principles of justice; and the court will not give an interpretation which takes away vested rights if the act is susceptible of any othet; nor will the court *infer* an intention of making an act retrospective

The issue follows the condition of the mother.

PETITION for freedom.

The mother of the petitioner was a slave, and by the will of her master, dated 12 May 1797, was manumitted in these words: "I give to my daughter Betsy my negro girl Rhoda until she arrives to the age of 30 years, then to have her freedom from slavery." The petitioner was born in 1805, before the mother attained the age of 30 years.

Mr *Thos. Robinson*, for petitioner, cited the act of 1810. *Dig.*409.

*Bayard,* for respondent. The common law of the State recognizes slavery: it is a condition existing among us previous to any statutory provisions. The presumption is that negroes are slaves,

chattel after verdict for plff., the judgment was arrested. Cites *Hart* vs. *Fitzgerald.* 2 *Mass. Rep.* 589.

Replevin—2 counts. 1. for A's undivided right in 450 spruce logs. 2nd. for the undivided half of 450 spruce logs. Deft. avows the taking and that the logs were the property of A., B. and C. as tenants in common, and that he had attached B's right or ¼. Verd. for plff. Judgment arrested. *Parsons* Ch. Jus. In contracts where one sues where the contract was with two, the deft. may take advantage of it on the general issue without pleading it; *a fortiori* if it appears from the plff's. own shewing. In tort for injury to a chattel where there are several joint owners and one sues it cannot be taken advantage of on the general issue, but must be pleaded in abatement even if it appears on the plff's. own shewing, for defts. may waive it. 6 *Term. R.* 766. Here the writ claims an undivided moiety. In trespass or case *damages* are given. In replevin the chattel is to be delivered as well as damages recovered. This chattel is not capable of severance and the whole or none must be delivered. If the whole, he gets a part in which he claims no property. There is no case where a part owner has brought replevin for his undivided part only. There is a strong distinction between trespass where damages are sought, and replevin where possession is claimed. Judgment arrested.

9 *Mass. R.* 427. *Gardner* vs. *Dutch.* Replevin for 76 bags of coffee shipped and stored with other bags, none being marked or numbered. A receipt had been given for 76 bags, weighing 8991 lbs. They were not marked or separated from the other bags. Verdict for plff. *Per. Cur.* If the plff. was tenant in common with W. and R, he could not maintain replevin for his undivided share. But he was not a tenant in common. He might have had the number of bags and quantity of coffee though the bags were not marked.

It appears therefore that replevin will not lie by the part owner of an undivided chattel; and, although not pleaded in abatement, advantage may

and until the act of 1797, the law recognized no means of emancipating them from slavery. The mother of this boy was a slave. Her offspring follows that condition. She was a slave at his birth and continued so until she attained 30 years, when by the operation of the will she became free. What was she in the mean time? Her natural condition was slavery; this condition was altered only by the will and not by that until a certain time. In the mean time she was a slave and her issue slaves. The right to the issue is the same with the right to the labor of the slave. Upon what principle therefore will a manumission to take effect at a future day, destroy the right to the issue in the mean time, any more than to the services of the mother in the mean time. Does the act of 1810 vary this: It is said to be declaratory. No legislature has, in this country, a right to pass a declaratory law. It may be in England, but under our written constitutions it must be different. We have distinct branches—Legislative, Judicial and Executive. The legislature may pass laws but

be taken of it on motion in arrest of judgment, where the defect appears on record. *Sed quere* if a count in a narr contains a sufficient cause of action connected with matter not actionable if it will not be intended, after verdict, that the damages were given only for the part that is actionable and the judgment will not be arrested.

*Gould.* 195. A declaration, though only of a single count, may be good as to part and ill for the residue; and, if the whole be demurred to, the plff. may have judgment for the part good.

In slander where any of the words are actionable judgment will not be arrested though the other words are not. It will be intended that the damages were given for the actionable words. *Cro. Eliz.* 328, 788; *Archb. Pl.* 196; 1 *Chitty Pl.* 384; 2 *Saund.* 171. *a.* After verdict the court will intend that damages were only given for the actionable part of the declaration. This was an action for *cutting a canal* through the plff.'s. land and *overflowing the same by leaks,* &c. and *stopping water courses.* The *cutting* was authorized by law. General damages were given and the verdict was sustained. There was only one count in the narr. 2 *Johns. R.* 283, *Steele* vs. *Western Lock Navigation Comp.*

With respect to actions of tort such as trespass *quare clausum,* or for taking goods, trover, case for malfeasance, or misfeasance and such like actions of *tort,* it seems fully and clearly established that if *one* only of two or more joint-tenants, parceners, tenants in common, partners, executors, assignors of bankrupt and others who regularly ought to join, bring any *such* actions, the deft. must plead the omission in abatement and cannot give it in evidence on the general issue, or in any other way, or by pleading in bar or in arrest of judgment or though the matter be found specially or appear on the face of the declaration or any other pleading of the plff. 1 *Saund. R.* 426 [219, *b.* 291. *a. n.* 4.] 6 *T. R.* 766, *Addison* vs. *Overends.*

If divers considerations be mentioned in one assumpsit and one is void and the others good, and damages given *ratione premissorum,* it shall be intended damages were given only for those that are good. 1 *Ld. R.* 146, 239.

In a single count with two allegations of damage, one actionable and the other not, the court will intend that damages were given for the actionable part. 2 *Johns.* 286-7.

Courts of justice will not encourage a man to lay by and take advantage of the mistakes of his adversary after verdict, when the same result would have taken place at an earlier stage. 2 *Johns.* 571; *Cro. Jac.* 664; 2 *Strange* 1094; 1 *Salk.* 129, 364; 1 *Days Cases in error* 30.

can't expound them;—that belongs to the judiciary. If they don't like the construction, legislatures may change it futurely; but not retrospectively. This boy was born before 1810, and it was not for the legislature of that year to say what was the law affecting his condition. Nor has their declaration weight as authority. Our legislatures are not competent to expound laws.

*Rodney*, for petitioner:

The mother of petitioner was a manumitted slave. He was born after the manumission but before the time when the mother was in fact free. By the manumission an inchoate or reversionary right of freedom attached to the condition of the mother; her condition was changed and she became free, subject only to the master's temporary and limited right to her services. Her issue is favorably affected by this change in her condition—they are free. The act of 1810 makes them slaves for a limited time, beyond which time the petitioner has advanced.

*Cur. adv. vult.*

April term, 1833. The Court, *Harrington*, *J*. dissenting, dismissed the petition.

Black, J.—George Vincent by his last will, dated May 12th, 1797, bequeathed as follows:—"I give to my daughter Betsey my negro girl Rhoda, until she arrives to the age of thirty years, then to have her freedom from slavery."

The petitioner Benjamin (now of the age of twenty-seven years,) is a son of Rhoda and was born in 1805, after the death of George Vincent and before his mother attained the age of thirty years, and claims to be free under the act of 1810.

Whether the 2nd section of the act of 1810 should be construed as embracing children who were living when that law was passed and had been born of female slaves manumitted to be free at a future day, or whether it was the design of the legislature, that that section should be applied to such children, are points not free from difficulty. In construing statutes the following rules may be considered as well established by judicial decisions, fully entitled to respect.

If a court can give a construction to a statute, consistent with the fundamental principles of justice and reason, it is their duty to do so. 1 *Bay's Rep.* 93.

A court is not to *presume* that the legislature designed to take away a vested right, nor ought their act to be so construed. 4 *Burr.* 2460; 6 *Johns. R.* 101; 1 *Bay's Rep.* 199.

They ought not to give to a law a retrospective operation or action if it be susceptible of any other, unless it be plainly so provided in the act. 7 *Johns.* 497, 503.

Is it a question free from doubt that the legislature of 1810, designed that the 2nd section should apply to children then in existence of such manumitted female slaves, or cannot the act be construed consistently with its provisions, without giving it such a retrospective operation, and if it can, should it not be so construed?

The first section provides that if by any deed of manumission or last will, any slave *hath been* or *thereafter* shall be declared to be free after serving a limited time, he or she shall in the mean time, until the term for which he or she shall be held to service (has ex-

pired,) be deemed to be a slave. This was designed to remove the doubts that were or might be entertained as to the character or condition of those who had been or should be thus manumitted. It did not alter or change the deed of manumission or its terms, or the rights either of the master or the slave, or any law existing in relation to negroes so circumstanced: but enacted as the law, neither more nor less than what the deed of manumission itself declared, that they were not free until the term had expired, and till then remained slaves, whether the writing by which their freedom was secured, was executed before or after that act passed. This section introduced no new rule, but recognized what must before its passage have been considered as the law, and which the deed or will plainly pointed out, viz: that on a certain future day they should be free; of course, till that day arrived they were not free; their condition was not changed, but remained as it had been, that of slavery.

The second section provides that the children of any such female negro *born within the said term of service,* shall be in like manner deemed and taken to be slaves; the males, until they arrive to the age of twenty-five, and the females to twenty-one. We *may* without straining the language of this section, construe it to embrace children born *before* its passage. It does not plainly and *unequivocally exclude,* nor does it plainly and *unequivocally include* children previously born. It does not say as well those *heretofore,* as those *hereafter* born. This would have been unequivocal language; but merely those *born within the said term of service.* Now if we construe those words to mean those born within the term of service to whom such a provision could according to the fundamental principles of legislation apply, that is, to those born after the passage of the law within the term of service, we give it a construction that makes the act consistent with the principles of reason and justice, and such a one as the legislature had the power constitutionally to pass; a prospective and not a retrospective act; an act which *respects,* not one that *violates* vested rights or the rights of property. It is not expressly provided that this act shall be *retrospective.* It is susceptible of being construed merely as a prospective act without doing violence to its terms or language. Are we not then, according to the rules for construing statutes to which I have referred, bound to give it such a construction, and thus relieve the legislature from the imputation of transcending their legitimate powers?

Do not the provisions of the 7th section afford some evidence that it was not designed to embrace children then born, *within the act?* That section requires a register of the name, age and sex, to be made within twelve months after its birth, of every child of such manumitted female, born *after* the passage of that act. What was the object of this provision, but to secure to those for whose benefit the act was passed, a record of their ages, that they might have this record evidence of their right to freedom when they attained the age fixed by the law. Now if it was intended to give children *then* born, freedom at twenty-five or twenty one, why were not their names also directed to be registered, that record evidence of their time of freedom might also be secured to them. There however, is no such provision for them, and yet there existed the same reason for the register in the one case as in the other. May we not then from a con-

sideration of the whole act reasonably infer, that the issue of such slaves *then born* were not designed to be embraced within it, and is not this construction warranted by the rules established for the construction of statutes, and at the same time the most respectful to the legislature, as it makes their act a valid act when an opposite construction would compel us to hold it to be an invalid one?

Supposing, however, that this view cannot be sustained, and that the act of 1810, embraced the issue of such females *then* born, as well as those *thereafter* to be born, the validity and bearing of such an act on children then born, and on the rights of the owners of such children must be considered.

If that act is to be considered as an act declaratory of what the law was before its passage, it cannot as such have any weight with the court. Each department of our government must operate and be confined within its constitutional limits. The power that makes, is not the power to construe a law. The legislature may declare what the law *shall* be, but not what *it is* or *has been.* That power belongs to the judicial department alone, and they in discharging their duty are to form their own opinion and are not to be the mere organ of the legislature and declare its opinion of what the law is or has been. This proposition is one so clear that the Supreme Court of the U. States, in the case of *Ogden* vs. *Blacklidge, 2 Cranch* 977, declined hearing an argument in its support, and stopped the counsel who was about to sustain it.

If it cannot then avail as a declaratory, but is to be considered as a positive and enacting law, adopting a new rule as to property, can it according to the nature of society and of government and of those general principles which are common to our free institutions (independent of constitutional provisions,) operate upon and alter rights of property which by the laws of the land were fixed and vested at and prior to its passage? In relation to contracts or property is an act valid and obligatory which by a retrospective action is to change the contract, or divest or abridge the rights of property?

Is it competent for a legislature to enact that a title to property, which at the time the property was acquired was absolute and unqualified under the existing laws, shall thenceforth be a qualified or limited title and not an absolute one?

Such positions would seem to be in direct hostility to the sound and established principles of justice and reason, and entirely inconsistent with the spirit of a free and republican government. If they are to prevail they would leave the rights of property unsecured by fixed principles or a firm tenure; and at the will, pleasure or caprice of each succeeding legislature. A *retrospective* act, so far as it changes or divests the vested rights of property, and takes away that property or declares the title to it, or tenure of it, to be less valid than by the enacting law it antecedently was, violates fundamental principles, and cannot be considered a valid or binding one. 1 *Kent* 448, 454; 7 *Johns.* 477; 1 *Bay's Rep.* 98, 252; 2 *Bay's Rep.* 28; 2 *Dallas* 310.

By the constitution of our state the right to acquire and protect property is declared to be a right *essential* to and *inherent* in every

11

man. This right cannot be fettered, restrained or abridged, except so far as authority so to do has been granted in the same instrument; unless the power be there found it does not exist. The only provision which we there find for taking the property of an individual from him is in the 8th section of the 1st article, and in these words: "nor shall any man's property be taken or applied to *public* use without the consent of his representatives, and without *compensation being made.*"

The legislature cannot take from an individual his property even for *public use,* without making him compensation.

To take property from one and grant it to another, even if compensation be made, or to take it for the public use, without compensation, is a power expressly denied to our legislature, and every such act is directly in violation of that constitution and of course void.

In this state slaves are the subjects of property. If the legislature can constitutionally enact that a person who by the existing laws has a perfect title to the time and services of a slave for his life shall only hold that slave and have the benefit of his services till the slave attains twenty-five, why may they not also enact a law that lands which are held by a man under a devise to him and his heirs forever shall only be enjoyed by the devisee until he attains twenty-five, and that all his right therein should then cease? Where would be the difference in principle? If they can abridge or alter the existing tenure or title of the one species of property, why can they not alter the other. The land and the slave are equally property, and why are the rights of the one species of property to be held less sacred and inviolable than those of the other. The constitution guarantees protection to property of every kind without any exception: establish the position that it is *property* that is to be touched, and you find the power of the legislature is limited by broad constitutional lines beyond which it cannot pass. As long as this unfortunate class of beings are recognized by our laws as the subject of property, the general rules of property, and of the rights to property must attach, and protection be extended according to the settled principles of law.

If therefore the petitioner was, before the act of 1810, a slave for life, that slavery cannot be reduced to the term of twenty-five years by that act,—the master had a property in him beyond these twenty-five years, which could not be taken even for *public use* without his being compensated—no such compensation is provided by the act, and it is therefore unnecessary to examine whether such a taking would be for public use or private benefit.

Whether a law predicated on principles of public policy and safety designed to attain an important and general public good, by relieving the community from a great and acknowledged evil, operating alike upon all this class of property, and all the holders of this class of property, might not be passed by our legislature, consistently with those principles which should regulate the exercise of their powers, by *which slavery should be altogether abolished,* is not a question now before us and it will be time enough to pass on such a case when it is presented. I may however remark that in the state of Pennsylvania where for more than fifty years, the attention of their legislature

has been directed to the abolition of slavery; they have not in any instance, according to my research, passed a law giving or securing freedom to a slave in *being* when the law passed. Their legislation has been prospective and not retrospective. The rights of property in slaves have invariably been respected, and the law by its terms made to bear upon and secure freedom to those only who should be born after its passage. The provision of the constitution of that state in relation to the security of property, is, with the exception of a single word, the same with that in ours. With us *compensation* is to be made—with them it is *just* compensation.

The act of 1810, therefore, whether it be considered as a declaratory act, or an act establishing a new rule of law, cannot govern this case. This petitioner was born in 1805. The rights of the master existed and were fixed five years before this act passed. What those rights were, must be ascertained from the *then* existing law and must prevail. If he then held the petitioner as a slave for life, the act of 1810 cannot reduce his title to a slavery for twenty-five years. The present case must be decided as though that statute had never been passed.

In 1805 there existed no provision in our statutes regulating or declaring the condition or character of the issue of female slaves who were manumitted to be free at a future day. The condition of the mother at the birth of the petitioner must regulate his condition. The rule—*Partus sequitur ventrem* must prevail—if she was free then he was free—if she was then a slave, he also was a slave, for there was no intermediate grade of servitude prescribed by the *law*, which could apply to his case, nor was any limited or qualified period of service secured to him by the will of Mr. Vincent. That will guaranteed to the mother a certain right, but none to her issue.

When Rhoda attained the age of thirty she was to have "freedom from slavery"—not before—till that period arrived she was not to be *free from slavery*, nor from her legal condition as a slave, but all the disabilities and incidents of slavery remained with and were attached to her: till she attained thirty there was to be no change—if that period arrived, then, and not till then, her character and condition of a slave ceased—her condition was not one of modified servitude, but by the express terms of the act that of a slave. By the will of Mr. V. a right was secured to her that *when* she reached the age of thirty she should be free, but if she had died before that age no change in her condition would have taken place, but she would have died a slave. Rhoda had not attained the age of thirty when the petitioner was born, but remained a slave. 'Tis true, that slavery was to *cease as to her* at thirty; but this was, by the terms of the will. There was, as I have said, no such provision in the will in favor of *her issue*—nor did there *then* exist any law removing from *such issue* the chains or incidents of slavery *for life*. Would it not be an arbitrary act for this court to say that the petitioner was entitled to his freedom at twenty-one twenty-five or thirty, or at any other period which they might think proper to *assume*, when in their judgment the act of 1810 does not apply to his case—when no law existed at his birth which made such a provision, and when the will of Mr. Vincent does not secure it to him? Upon what

grounds other than the arbitrary discretion of the court could such a period of service be assumed, and such a decision be founded: a sound discretion based upon the law of the land I am willing to exercise: but I cannot go further—I will not legislate.

The petitioner at the time of his birth, was, as the law then stood and by which his condition was fixed and is now to be governed, either *unconditionally free* or a *slave for life*—he was not born free for his mother was then a slave—of course therefore he was born a slave, and that slavery was and is for life, as it is not limited to a shorter period by any valid law which applies to his case, or by the will of Mr. Vincent the master of the mother.

It is therefore my opinion that the petition be dismissed. (*a*)

CLAYTON, C. J., concurred in opinion that the petition should be dismissed; and it was so ordered.

HARRINGTON, J.—It was argued in this case that the condition of slavery was recognized by the common law of this State. That it conferred on the master an unlimited right to the services of the slave and subjected the issue to the same liability. A practice has grown up, recognized and authorized by law, of changing the condition of this species of property by manumission to be free at a future day: and an important question arises as to the condition of the offspring of female slaves thus manumitted, born between the act of manumission and the period of its taking full effect. By the act of manumission the mother acquires a vested right: the master has no longer an unlimited control over her services, and it would seem to follow, that he had no longer an unlimited control over the services of her offspring. The child follows the condition of the mother. At its birth the mother is not in the condition of absolute slavery, but only of limited slavery, owing services for a limited period; if the child be in the same condition it is that of limited slavery, measured by the term of its mother's servitude. This is the view I take of the question as it stood before the act of 1810. The principle is no doubt prejudicial to the master and imposes a great hardship on him of maintaining the infant children of his manumitted slaves; but it follows from the principles assumed, and is a consequence of his own act of manumission. The injustice of such a case as it regards the master was probably the origin of the act of 1810. That act neither recognizes the unlimited right of the master to the services of the issue of his manumitted slave, nor confines his right to the period of the mother's servitude, but assumes a reasonable medium based on the ground of the limited right of the master, and compensation to him for the expense of raising the slave. It makes the males slaves until 25; and the females until 21 years old. This act was passed on the recommendation of Governor Truitt; and it seems probable, from the terms he uses in bringing the subject to their notice, that the legislature proceeded rather on the ground of *extending* the time of service as a compensation to the master than on any idea of *restricting* any rights that he pos-

(*a*) See the case of M'Cutchen et al. *vs.* Marshall, 8 Peters 221, decided by the Supreme Court in January 1834, sustaining the last ground in the foregoing opinion.

sessed.   Gov. Truitt says *(Journal H. R.* 1810, *vol.* 3, *p.* 9.*)*
"It has become a frequent practice for masters to execute deeds of
manumission to their slaves by which they are permitted to go at
liberty at a future period, and in the mean time their services are
retained.   So many negroes are now in this situation that it is a
matter of great importance to ascertain what their condition is; for
if it is slavery the issue of female parents are necessarily all slaves:
on the contrary, if it is freedom, the issue at the moment of their
birth are free and owe no service to the master.   And is the master,
having no right to command their services for a single moment,
bound to maintain them in their infancy? the mother cannot; and
must the public be burdened with the expense?   The courts, fore-
seeing the inconveniences which would arise from a determination
of this question in either way by them, have avoided, as far as I can
learn, making any decision; but whenever it shall come directly be-
fore them they will be bound to decide let the inconveniences flow-
ing from that decision be what they may; and the legislature being
the only proper authority competent to make the necessary provi-
sions to meet the exigency of the case, I have considered it my
duty to recommend it to your notice."   The report of the commit-
tee of the House of Representatives on this part of the message de-
clares:—1st. That manumitted slaves are entitled to all the benefits
of bound servants and not slaves; 2nd. That the issue shall be con-
sidered as bound servants until the age of ——, and not as slaves—
provided the master keeps and raises them.

It is true that slavery is tolerated by our laws; but it is going too
far to say that this kind of property in slaves is precisely like every
other species of property.   The spirit of the age and the principles
of liberty and personal rights as held in this country are equally op-
posed to a doctrine drawn from the ages and the countries of despot-
ism, and founded either proximately or remotely in oppression.   Sir
William Blackstone remarks that pure and proper slavery is con-
trary to reason, and the principles of natural law; and he shows con-
clusively that the grounds on which slavery is placed by the
civil law all rest on unsound foundations.   1 *Black. Com.* 450;
2 *Kent C.* 247.   Accordingly it has long since been abolished in
England; and in many, perhaps in most, of these United States
it has either been done away or provision has been made for its
prospective abolishment.   In the state of New-York, an act of
assembly declared all children born of slaves after the 4th July,
1799, should be born free, though liable to be held until 28 and 25
years of age; and a subsequent act declared that all negroes, &c.,
born before the 4th July, 1799, should be free after the 4th July, 1827,
at which time slavery became extinct in that state.   In Pennsylva-
nia, by the act of 1780, masters were required to register their
slaves and the issue of such slaves born after the acts were subjected
to a servitude of only 28 years. *Vide* 1 *Dal. R.* 467.   These provi-
sions have been further extended in favor of liberty, so that there
now remain in that state, as appears from a statement lately made by
a committee of their legislature, less than one hundred slaves with
a certainty of the speedy extinction of slavery there.   These acts
(and similar ones exist in many other states, our own included) deny

to the master that unqualified ownership over his slave and her issue that he possesses over other property; and continuing unrepealed if not uncontroverted, upheld by the undoubted sentiment of the times and the extended spirit of liberty, they establish a right in the government to regulate this species of property in conformity with the acknowledged principles of reason and justice as well as the requirements of public policy.    It was on this principle that our legislature in the act of 1810, *declared* that the children of manumitted slaves should not be considered slaves for life, and regulated the period of their slavery upon principles of justice as well to the master as the slave.

On the best consideration I have been able to give the case, I regret that I have not been able to bring my judgment into coincidence with that of the other members of the Court.    I think the petitioner, being now 25 years of age, is entitled to his freedom.

.Petition dismissed.

*Robinson* and *Rodney*, for petitioner.
*J. A. Bayard*, for respondent.